253 P.3d 413 (2011)
161 Wash.App. 172
STATE of Washington, Respondent,
v.
Anthony Marquise EMERY, Jr. and Aaron Edward Olson, Appellants.
Nos. 39119-8-II, 39120-1-II.
Court of Appeals of Washington, Division 2.
April 13, 2011.
*418 Valerie Marushige, Attorney at Law, Kent, WA, David L. Donnan, Lila Jane Silverstein, Washington Appellate Project, Seattle, WA, for Appellants.
Thomas Charles Roberts, Attorney at Law, Tacoma, WA, for Respondent.
VAN DEREN, J.
¶ 1 In this consolidated appeal, Anthony Emery and Aaron Olson appeal their convictions for first degree kidnapping, first degree robbery, and two counts of first degree rape. Emery argues that (1) the trial court erred in denying Olson's motion to sever their trials, (2) his counsel was ineffective in failing to move for severance, (3) the trial court erred in denying a mistrial motion based on Olson's outbursts while Emery testified, and (4) the trial court erred in denying a motion for a new trial based on failure to sever their trials and Olson's outbursts. Olson argues that (1) the prosecutor committed misconduct during closing argument that entitles him to a new trial, (2) sufficient evidence does not support the alternative means alleged in the first degree robbery and first degree rape charges, and (3) the trial court erred in denying his motion to sever their trials. In a pro se statement of additional grounds for review (SAG)[1], Olson also argues that (1) the State violated his speedy trial rights by filing a second amended information and (2) probable cause did not support a search warrant for his residence. We affirm.

FACTS
¶ 2 On February 27, 2006, shortly after 11:00 PM, GC,[2] who worked at a Tacoma pharmacy, attempted to leave work in her boyfriend's new vehicle. She had trouble opening the car door and called her boyfriend for help. Because he was unable to help, she turned to go back into the pharmacy.
¶ 3 As she turned, she saw two men standing very close to her. She described one of them as a white male and the other as a "Filipino." Report of Proceedings (RP) at 100. The white male pointed a gun at her stomach and demanded money. GC later described the firearm as a black semiautomatic and distinguished a semiautomatic firearm from a revolver. The white male took GC's telephone, and she told the men that she had no money. He then ordered her to open the vehicle, which she was able to do. Because she thought the two men were going to abduct and possibly murder her, GC dumped the contents of her pockets in the parking lot; these items included her employee identification badge and a tube of lip balm. The white male got in the passenger seat and ordered her to drive, and the other man got in the back seat.
¶ 4 The white male ordered GC to drive to the parking lot of another Tacoma business and to park in a dark spot not visible from the street. The men again demanded money. When she repeated that she had none, the white male told her that, because she had no money, they were going to rape her and *419 he ordered her into the back of the vehicle. GC, attempting to convince the men to let her go, claimed that she was pregnant and pleaded with them to not rape her. After discussion with the other man, the white male told her that, because she was pregnant, she would have to perform oral sex. The white male pointed the gun at GC and threatened to kill her if she did not comply.
¶ 5 The white male and GC moved into the back of the vehicle, where GC performed oral sex while the other man waited outside. After the white male ejaculated, GC wiped his semen on her pants. She feared that the two men were going to kill her and she wanted to leave evidence with which to identify them. Then, the white male signaled the other man, who got into the back of the vehicle. GC performed oral sex on him and, after he ejaculated, GC wiped some of his semen on her work smock, again hoping to leave identifying evidence.
¶ 6 The white male took the wheel and started to drive. GC remained in the back with the other man and again begged them not to kill her. They drove to a third Tacoma business, where the two men exited the vehicle. The white male told her that they knew where she worked and that they would kill her if she contacted the police. The other man looked at her, smiled, and they walked away. GC drove to Idanya Gonzalez's nearby residence. GC, hysterical and crying, vomited into the toilet and described the attack to Gonzalez.
¶ 7 Responding Tacoma Police Patrol Sergeant Corina Curtis observed that GC was hysterical, crying, lying on the floor in the fetal position, and vomiting into the toilet at Gonzalez's residence. Gonzalez stated that GC told her that the men were armed with a black pistol. Law enforcement collected forensic evidence from GC, including her clothing, and recovered items matching GC's description of her pocket contents dumped in the pharmacy parking lot. A forensic sketch artist drew composite drawings of the two suspects based on GC's descriptions.[3]
¶ 8 On December 8, 2006, Tacoma Police Detective Jeffrey Turner obtained a search warrant for Olson's residence. Turner averred that, on November 8, 2006, another law enforcement officer relayed to him that an anonymous informant had stated that Olson had claimed responsibility for a series of rapes and robberies. The informant indicated that Olson closely resembled the sketch of one of the suspects in GC's case and that Olson associated with a "Samoan" male. Clerk's Papers (CP) (Olson) at 120. The informant provided an address for Olson, which law enforcement officers verified as his home address. A records check indicated that Olson and Emery were listed as suspects in an attempted residential burglary and that Emery was described as an "Asian/Pacific Islander." CP (Olson) at 120. When contacted, Emery indicated that he and Olson had been friends for years.
¶ 9 Turner created separate photomontages that included Emery's and Olson's photographs. When shown the photomontages, GC immediately and positively identified Emery as one of her assailants, but she could not positively identify Olson. A witness to a March 7 attempted robbery viewed the photomontages and positively identified Olson as one of the two assailants and the victim of the March 7 attempted robbery positively identified both Emery and Olson as her assailants. The State obtained orders allowing it to take deoxyribonucleic acid (DNA) samples from Emery and Olson. The Washington State Patrol crime laboratory confirmed that Olson's DNA matched the semen on GC's pants, and that Emery's DNA matched the semen on GC's smock. The trial proceeded on four counts against both Emery and Olson: (1) first degree kidnapping (count I), (2) first degree robbery (count II), (3) first degree rape of GC (count III), and (4) first degree rape of GC based on accomplice liability (count IV).
¶ 10 Olson unsuccessfully sought to suppress the evidence seized at his house based on lack of probable cause to support the search warrant. Specifically, Olson contended *420 that the State failed to demonstrate the reliability of the anonymous informant and the veracity of that informant's information, thus, fatally undermining the warrant. The State responded that law enforcement's subsequent investigation of Olson provided independent bases for the probable cause supporting the search warrant.[4]
¶ 11 On December 29, 2008, Olson filed a pretrial motion to sever his trial from Emery's trial. Emery filed a pretrial motion to sever his own multiple charges into separate trials. Olson argued that his defense based on mistaken identity was mutually antagonistic to Emery's planned strategy to argue that both he and Olson were present during the event but that there was no gun involved. The trial court questioned Emery's counsel about his defense and about Emery's anticipated testimony:
[COUNSEL]: We are not providing an alibi defense, Your Honor.
....
[COUNSEL]: ... [Emery] would testify as to the issue of a weapon, the nonexistence of a weapon.
[THE COURT]: All right. He will otherwise acknowledge being there.
[COUNSEL]: Apparently so, yes, Your Honor.
[THE COURT]: He is intending to acknowledge some or all of these acts?
[COUNSEL]: Yes, Your Honor. Some of the acts, yes.
[THE COURT]: With respect to at least the counts that have been severed for this trial, he is going to indicate that Mr. Olson was present?
[COUNSEL]: If he is asked, yes, Your Honor.
I RP at 45-46. When questioned further by the court, Emery's counsel reiterated that "Emery, if he testifies, which he probably will, would testify that the events occurred, [Olson] was there, and there was no gun." RP at 55. The trial court reasoned that Emery was contesting the degree of the offense as opposed to whether the crime happened, contrasted this with a situation where one codefendant presents an alibi defense and the other presents a total defense (such as self defense) implicating both defendants, and concluded that Emery's and Olson's defenses were not mutually antagonistic. The trial court denied Olson's motion to sever.
¶ 12 Trial began on January 8, 2009. Before the State presented its first witness, Olson unsuccessfully renewed his motion to sever his trial from Emery's. After the State rested its case, Olson again renewed his motion to sever his trial from Emery's. Emery's counsel did not argue in favor of severance and, instead, stated that "if [the trial court] grant[ed] the motion, [he did not] see any reason why [they] [could not] proceed with the jury as far as Mr. Emery's case [wa]s concerned. [They we]re ready to proceed with his case." RP at 623. The trial court denied the motion.
¶ 13 Emery testified that Olson was with him on February 27, 2006, and that GC had performed oral sex. He said that he was listening to music through headphones, and that he could not hear what Olson said to GC before parking at the second business. He assumed that Olson knew GC and that she was giving them a ride to Olson's residence. Olson told him that GC agreed to the sex, and Emery thought GC appeared normal, so he did not think that GC was "being forced into anything that she didn't want to do." RP at 642. Emery also testified that Olson was the only person with him and that there was no firearm present during their encounter with GC.
¶ 14 Olson interrupted Emery's testimony, saying, "You are sitting there lying, man[.]... This is perjury[.] ... I [have] been wrongly accused." RP at 693. The trial court excused the jury. The trial court cautioned Olson that it could subject him to gagging or removal from the courtroom for another outburst. Emery unsuccessfully moved for a mistrial. The trial court instructed the jury to disregard Olson's comments. Olson again interrupted Emery's *421 testimony, saying, "That's a lie. I was not there." RP at 708. The trial court did not instruct the jury to disregard this comment, stating only, "Mr. Olson, not another outburst, sir." RP at 708. The trial court instructed the jury that the evidence they were to consider during their deliberations was witness testimony and the admitted exhibits, and that they were the sole judges of witness credibility.
¶ 15 Contrary to Emery's testimony, Olson testified that he was resting at home with a foot injury on February 27, 2006, and that he was not with Emery that night. Olson implied that the DNA evidence linking him to GC was the result of laboratory error.
¶ 16 After the conclusion of the evidence, Olson renewed his motion to sever his trial from Emery's. The trial court remarked that Emery's testimony Was "a little different" from what the court had anticipated from the pretrial representations of Emery's counsel, in that Emery implied that the sex was consensual in addition to stating that no gun was present; but, it denied Olson's motion.
¶ 17 The trial court's first degree robbery instruction stated that the State had to prove beyond a reasonable doubt that Olson was "armed with a deadly weapon or displayed what appeared to be a firearm or other deadly weapon." CP (Olson) at 274. The first degree rape instruction also stated in part that the State had to prove beyond a reasonable doubt that Olson "used or threatened to use a deadly weapon or what appear[ed] to be a deadly weapon." CP (Olson) at 284, 286. The trial court's instructions stated that "[a] firearm, whether loaded or unloaded is a deadly weapon." CP (Olson) at 273.
¶ 18 During closing arguments, after discussing the State's evidence and how it corroborated GC's testimony, the prosecutor stated, "[GC] has no reason to lie to you. No reason to lie to any of the people that she has talked to about this case." RP at 827. When discussing the reasonable doubt standard, the prosecutor stated:
What it means is, in order for you to find the defendant not guilty, you have to ask yourselves or you'd have to say, quote, I doubt the defendant is guilty, and my reason is blank. A doubt for which a reason exists. If you think that you have a doubt, you must fill in that blank.
RP at 830.
¶ 19 The prosecutor continued:
I want to talk to you right now about a Latin term, "verdictum." The Latin term "verdictum" I'm told is the Latin root for the English word "verdict." The literal translation of "verdictum" into the English language is to speak the truth. Your verdict should speak the truth.
In this case, the truth of the matter, the truth of these charges, are that Aaron Olson is guilty of Robbery in the First Degree, Kidnap in the First Degree, . . . and Rape in the First Degree, which is the same for Tony Emery, for the offenses that he committed on February 27th, 2006, against [GC].
Members of the jury, I ask you, go back there to deliberate, consider the evidence, use your life experience and common sense, and speak the truth by holding these men accountable for what they did.
RP at 831-32. Neither Emery nor Olson objected to any of these statements.
¶ 20 The jury convicted Emery and Olson as charged. Emery filed a motion for a new trial based on the trial court's denial of Olson's motion to sever their trials and his own motion for a mistrial. The trial court denied the motion.
¶ 21 Emery and Olson appeal.

ANALYSIS

I. EMERY'S APPEAL

A. Waiver of Severance Issue
¶ 22 Emery argues that the trial court erred in denying Olson's motion to sever their trials because their defenses were irreconcilable and mutually antagonistic.[5] *422 The State counters that Emery waived this challenge by failing to bring his own motion to sever their trials at the trial court.
¶ 23 CrR 4.4(a) provides:
(1) A defendant's motion for severance of offenses or defendants must be made before trial, except that a motion for severance may be made before or at the close of all the evidence if the interests of justice require. Severance is waived if the motion is not made at the appropriate time.
(2) If a defendant's pretrial motion for severance was overruled he may renew the motion on the same ground before or at the close of all the evidence. Severance is waived by failure to renew the motion.
¶ 24 Here, contrary to Emery's contention, he moved before trial for severance of only charges, not defendants. When Olson moved before trial to sever the defendants' trials, Emery offered no supporting argument and failed to join in Olson's motion; he responded only to the trial court's inquiries about the nature of his testimony and defense. Likewise, when Olson renewed his motion to sever their trials after the State rested, Emery offered no argument in support of Olson's motion, nor did he join the motion. Additionally, he stated only that he could proceed with the trial with the same jury if the trial court granted Olson's motion. Thus, we hold that Emery has waived this issue.

B. Ineffective Assistance of Counsel
¶ 25 Emery next contends that his counsel was ineffective for failing to move for severance of his trial from Olson's trial. We review claims of ineffective assistance of counsel de novo. State v. McFarland, 127 Wash.2d 322, 334-35, 899 P.2d 1251 (1995). To prevail on an ineffective assistance of counsel claim, the defendant must show that defense counsel's objectively deficient performance prejudiced him. McFarland, 127 Wash.2d at 334-35, 899 P.2d 1251. We strongly presume that counsel is effective and the defendant must show no legitimate strategic or tactical reason supporting defense counsel's actions. McFarland, 127 Wash.2d at 335-36, 899 P.2d 1251.
¶ 26 To demonstrate prejudice in the joint trial context, the defendant must show that the trial court likely would have granted a severance motion and that, if he were tried separately, there was a reasonable probability he would have been acquitted. In re Pers. Restraint of Davis, 152 Wash.2d 647, 711, 101 P.3d 1 (2004). A failure to demonstrate either deficient performance or prejudice defeats an ineffective assistance claim. See McFarland, 127 Wash.2d at 334-35, 899 P.2d 1251; see also Strickland v. Washington, 466 U.S. 668, 700, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
¶ 27 Here, GC positively identified Emery, the evidence corroborated her version of events, and the DNA evidence linked him to the crimes. His defense strategy was to admit the sex act, but to claim lack of criminal intent and to implicate Olson. As trial strategy, his admissions could have had a more favorable impression on the jury, in contrast to Olson's denials, when faced with the DNA evidence. Thus, Emery fails to show that his counsel's decision to proceed with a joint trial was not supported by legitimate strategic or tactical reasons. We hold that Emery's counsel's performance was not deficient. Because Emery fails to satisfy the first prong of the ineffective assistance of counsel test, we need not address the second prong.[6] *423

*424 C. Motion for Mistrial
¶ 28 Emery also argues that the trial court erred in denying his motion for mistrial based on Olson's outbursts during Emery's testimony. We review the trial court's denial of a motion for mistrial for abuse of discretion. State v. Allen, 159 Wash.2d 1, 10, 147 P.3d 581 (2006). A trial court abuses its discretion if its decision "`is manifestly unreasonable or based [on] untenable grounds.'" Allen, 159 Wash.2d at 10, 147 P.3d 581 (quoting State v. Stenson, 132 Wash.2d 668, 701, 940 P.2d 1239 (1997)). "In determining the effect of an irregular occurrence during trial, we examine `(1) its seriousness; (2) whether it involved cumulative evidence; and (3) whether the trial court properly instructed the jury to disregard it.'" State v. Johnson, 124 Wash.2d 57, 76, 873 P.2d 514 (1994) (quoting State v. Hopson, 113 Wash.2d 273, 284, 778 P.2d 1014 (1989)).
¶ 29 Emery relies on State v. Miles, 73 Wash.2d 67, 69-70, 436 P.2d 198 (1968), claiming that Olson's outbursts were of sufficient seriousness to merit a mistrial. But Miles involved a police officer's testimony that Miles, when arrested, was on his way to another location to duplicate the robbery with which he was charged. 73 Wash.2d at 67-68, 436 P.2d 198. This justified granting a new trial because it "implant[ed] in the minds of the jury the idea that [Miles] had committed other robberies of this type and [wa]s therefore most likely to have committed the one charged." Miles, 73 Wash.2d at 70-71, 436 P.2d 198. Here, Olson's outbursts focused only on Emery's credibility, not on his culpability for other, similar crimes.
¶ 30 Furthermore, Olson's outbursts were consistent with Olson's rebuttal testimony. The jury could infer from other independent evidence that Emery was not credible, namely, from the testimony of the State's witnesses and Olson's alibi testimony. Thus, Olson's outbursts were merely cumulative of evidence.
¶ 31 Finally, the trial court instructed the jury to disregard Olson's initial outburst. Similarly, before the jury began deliberations, the trial court also instructed the jury that the evidence they were to consider in their deliberations was witness testimony and admitted exhibits and that they were the sole judges of witness credibility. We assume the jury followed these instructions. State v. Anderson, 153 Wash.App. 417, 432, 220 P.3d 1273 (2009), review denied, 170 Wash.2d 1002, 245 P.3d 226 (2010). Thus, we hold that the trial court did not abuse its discretion in denying Emery's motion for mistrial based on Olson's outbursts.

D. Motion for a New Trial
¶ 32 Finally, Emery contends that the trial court erred in denying his motion for a new trial because the trial court should have severed his trial from Olson's trial and because it should have declared a mistrial based on Olson's outbursts.
¶ 33 We review a trial court's denial of a motion for a new trial for an abuse of discretion. State v. Burke, 163 Wash.2d 204, 210, 181 P.3d 1 (2008). Because Emery waived the severance issue, defense counsel was not ineffective in not moving for severance and the trial court did not abuse its discretion in denying the mistrial motion, we hold that the trial court did not abuse its discretion in denying Emery's motion for a new trial.

II. OLSON'S APPEAL

A. Prosecutorial Misconduct
¶ 34 Olson argues that four statements the prosecutor made during closing argument constituted prosecutorial misconduct. These statements were: (1) that "`the truth of the matter'" was that Olson was guilty; (2) "`[GC] had no reason to lie'"; (3) the jury's role was to "`speak the truth'"; and (4) the jury had to "`fill in the blank'" to find reasonable doubt. Br. of Appellant (Olson) at 22-23, 28 (quoting RP at 827, 831).
¶ 35 A defendant claiming prosecutorial misconduct must show both improper conduct and resulting prejudice. State v. Fisher, 165 Wash.2d 727, 747, 202 P.3d 937 (2009). Prejudice exists where there is a substantial likelihood that the misconduct affected the verdict. State v. McKenzie, 157 *425 Wash.2d 44, 52, 134 P.3d 221 (2006). We review a prosecutor's comments during closing argument in the context of the total argument, the issues in the case, the evidence addressed in the argument, and the jury instructions. State v. Dhaliwal, 150 Wash.2d 559, 578, 79 P.3d 432 (2003).
¶ 36 Defense counsel's failure to object to prosecutorial misconduct at trial constitutes waiver of the objection on appeal unless the misconduct is "`so flagrant and ill-intentioned that it evinces an enduring and resulting prejudice'" and is incurable by a jury instruction. Fisher, 165 Wash.2d at 747, 202 P.3d 937 (internal quotation marks omitted) (quoting State v. Gregory, 158 Wash.2d 759, 841, 147 P.3d 1201 (2006)).
¶ 37 It is improper for a prosecutor to state a personal belief about the guilt or innocence of the accused. State v. Reed, 102 Wash.2d 140, 145, 684 P.2d 699 (1984). But we will not find prejudicial error unless it is "`clear and unmistakable that counsel is not arguing an inference from the evidence, but is expressing a personal opinion.'" McKenzie, 157 Wash.2d at 54, 134 P.3d 221 (emphasis omitted) (quoting State v. Papadopoulos, 34 Wash.App. 397, 400, 662 P.2d 59 (1983)). Here, the prosecutor made the "truth of the matter" statement at the end of closing argument, after discussing the State's evidence. When viewed in context of the prosecutor's entire argument, it indicated only an inference from the State's evidence, not a clear statement of personal opinion.
¶ 38 It is also improper for a prosecutor to state a personal belief about the credibility of a witness. State v. Warren, 165 Wash.2d 17, 30, 195 P.3d 940 (2008), cert. denied, ___ U.S. ___, 129 S.Ct. 2007, 173 L.Ed.2d 1102 (2009). But we will not find prejudicial error "unless it is clear and unmistakable that counsel is expressing a personal opinion," Warren, 165 Wash.2d at 30, 195 P.3d 940, such as "`I believe [the witness]. I believe him.'" State v. Brett, 126 Wash.2d 136, 175, 892 P.2d 29 (1995) (emphasis omitted) (quoting State v. Sargent, 40 Wash.App. 340, 343, 698 P.2d 598 (1985)). Again, when viewed in the context of the prosecutor's entire argument, the prosecutor here did not clearly express a personal belief in GC's credibility. Rather, the prosecutor generally stated that the evidence corroborated her testimony and that the evidence contained no indication of a motive to lie.
¶ 39 But the prosecutor's third and fourth statements are problematic. In Anderson, the prosecutor argued to the jury that "[t]he word `verdict' comes from the Latin word `veredictum,' which means to declare the truth. So, by your verdict in this case, you will declare the truth about what happened." 153 Wash.App. at 424, 220 P.3d 1273. The trial court overruled Anderson's objection to this argument. Anderson, 153 Wash.App. at 424, 220 P.3d 1273. On appeal, we held that this argument was improper because "[a] jury's job is not to `solve' a case. . . [r]ather, the jury's duty is to determine whether the State has proved its allegations against a defendant beyond a reasonable doubt." Anderson, 153 Wash.App. at 429, 220 P.3d 1273. But we also held that there was not a substantial likelihood that this argument affected the verdict in light of the trial court's jury instructions regarding the jury's duty and the thorough discussion of the evidence by both counsel during closing; thus, the argument was not prejudicial. Anderson, 153 Wash.App. at 429, 220 P.3d 1273.
¶ 40 The prosecutor in Anderson, without defense counsel's objection, also made the "fill in the blank" argument that "in order to find the defendant not guilty, you have to say `I don't believe the defendant is guilty because,' and then you have to fill in the blank." 153 Wash.App. at 431, 220 P.3d 1273. We held that the argument was improper because it subverted the presumption of innocence by implying that the jury had an initial affirmative duty to convict and that the defendant bore the burden of providing a reason for the jury not to convict him. Anderson, 153 Wash.App. at 431, 220 P.3d 1273. We did not hold, however, that the comments were flagrant and ill intentioned because the trial court's presumption of innocence instruction "minimized any negative impact on the jury." Anderson, 153 Wash. App. at 432, 220 P.3d 1273. We also noted the strength of the evidence against *426 Anderson, including multiple witnesses testifying to his crimes and surveillance footage confirming their testimony. Anderson, 153 Wash.App. at 432 n. 8, 220 P.3d 1273.
¶ 41 In State v. Venegas, the prosecutor argued, "In order to find the defendant not guilty, you have to say to yourselves: `I doubt the defendant is guilty, and my reason is'blank." 155 Wash.App. 507, 523, 228 P.3d 813 (internal quotation remarks omitted) (quoting Venegas Clerk's Papers at 2386), review denied, 170 Wash.2d 1003, 245 P.3d 226 (2010). We reiterated our holding that this argument was improper. Venegas, 155 Wash.App. at 524-25, 228 P.3d 813. We further held that this argument was so flagrant and ill intentioned that a jury instruction could not have cured it. Venegas, 155 Wash.App. at 523 n. 16, 525, 228 P.3d 813. We observed, however, that the case "largely turned on witness credibility." Venegas, 155 Wash.App. at 526, 228 P.3d 813. We further held that the cumulative effect of the prosecutor's improper conduct, excessive discovery sanctions preventing the defense from challenging the credibility of the victim's testimony, and improperly admitted evidence warranted reversal of Venegas's convictions under the cumulative error doctrine. Venegas, 155 Wash.App. at 526-27, 228 P.3d 813.
¶ 42 Finally, in State v. Johnson, 158 Wash.App. 677, 679-81, 243 P.3d 936 (2010), review denied, No. 85486-6, 171 Wash.2d 1013, 249 P.3d 1029 (Wash. Mar. 30, 2011) the case again largely turned on the jury's credibility determinations between Johnson, who presented an unwitting possession defense, and the arresting officers. During closing argument, the prosecutor again made the "fill in the blank" argument. Johnson, 158 Wash.App. at 682, 243 P.3d 936. We reiterated our previous holdings that this argument is improper. Johnson, 158 Wash. App. at 684-85, 243 P.3d 936. We further explained:
Although the trial court's instructions regarding the presumption of innocence may have minimized the negative impact on the jury, and we assume the jury followed these instructions, a misstatement about the law and the presumption of innocence due a defendant, the "bedrock upon which [our] criminal justice system stands," constitutes great prejudice because it reduces the State's burden and undermines a defendant's due process rights.
Johnson, 158 Wash.App. at 685-86, 243 P.3d 936 (alteration in original) (quoting State v. Bennett, 161 Wash.2d 303, 315, 165 P.3d 1241 (2007)); Anderson, 153 Wash.App. at 432, 220 P.3d 1273. We again observed that, with the particular conflicting evidence, we could not conclude "that [the prosecutor's] misstatements did not affect the jury's verdict." Johnson, 158 Wash.App. at 686, 243 P.3d 936. Thus, we applied our holding in Venegas that the prosecutor's argument was flagrant and ill intentioned and we reversed and remanded for a new trial. Johnson, 158 Wash.App. at 685-86, 243 P.3d 936.
¶ 43 We reiterate our holding in Anderson that the "declare the truth" or "speak the truth" argument is improper. 153 Wash. App. at 429, 220 P.3d 1273. We also reiterate our holdings in Anderson, Venegas, and Johnson that the "fill in the blank" argument is improper. 153 Wash.App. at 431, 220 P.3d 1273, 155 Wash.App. at 524-25, 228 P.3d 813, 158 Wash.App. at 684-85, 243 P.3d 936.
¶ 44 Despite these improper arguments, Olson must still demonstrate prejudice, i.e., a substantial likelihood that the prosecutor's improper statements affected the verdict. McKenzie, 157 Wash.2d at 52, 134 P.3d 221. In this respect, the case here is more like Anderson than Venegas and Johnson. Unlike Venegas and Johnson, this case was not largely a credibility contest in which the prosecutor's improper arguments could easily serve as the deciding factor. Instead, as in Anderson, here the State presented multiple witnesses and evidence corroborating GC's version of events, including the DNA evidence and the contents of her pockets recovered from where she was abducted. When viewing the prosecutor's misstatements in the context of the evidence against Olson (and Emery), we cannot conclude that there was a substantial likelihood that they affected the verdict. Thus, finding no prejudice, we similarly cannot conclude, as we did in Venegas and Johnson, that the prosecutor's misstatements were so flagrant and ill intentioned as to cause an enduring prejudice *427 incurable by a jury instruction. Accordingly, we hold that Olson fails to establish prejudice or prosecutorial misconduct requiring reversal.[7]

B. Denial of Motion To Sever Trials
¶ 45 Olson also appeals the trial court's denial of his repeated motions to sever his trial from Emery's trial, particularly in light of Emery's testimony that Olson was present at the crimes and was the instigator of the interaction with GC. Olson's argument to sever is much stronger than Emery's late-made claim, but we review it for manifest abuse of discretion, State v. Grisby, 97 Wash.2d 493, 507, 647 P.2d 6 (1982), applying the same reasoning and evaluating whether severance was necessary to "achieve a fair determination of the guilt or innocence of a defendant." CrR 4.4(c)(2)(ii). We seek to determine whether the joint trial was "so manifestly prejudicial as to outweigh the concern for judicial economy." State v. Hoffman, 116 Wash.2d 51, 74, 804 P.2d 577 (1991).
¶ 46 Olson "must be able to point to specific prejudice" to demonstrate that the trial court abused its discretion. Grisby, 97 Wash.2d at 507, 647 P.2d 6. As we earlier analyzed, Emery and Olson presented antagonistic defenses, such that the jury had to disbelieve Olson's alibi defense in order to believe Emery's statements that he had no criminal intent when he and Olson engaged in sexual contact with GC. See McKinzy, 72 Wash.App. at 90, 863 P.2d 594. But mutually antagonistic defenses are not per se prejudicial as a matter of law. Grisby, 97 Wash.2d at 507, 647 P.2d 6.
¶ 47 Olson must show "`that the conflict [wa]s so prejudicial that [the] defenses [we]re irreconcilable, and the jury . . . unjustifiably infer[red] that this conflict alone demonstrate[d] that both . . . [we]re guilty.'" Davis, 152 Wash.2d at 712, 101 P.3d 1 (quoting Hoffman, 116 Wash.2d at 74, 804 P.2d 577). In a separate trial, his alibi defense would have to overcome GC's testimony implicating him and the evidence corroborating her testimony, including his DNA on her clothing where she testified she put it, the contents of her pockets recovered from where she was abducted, and Gonzalez's testimony, as well as police testimony about GC's hysterical demeanor and statements at Gonzalez's residence. Even though GC's description of Olson was apparently not totally accurate and she could not identify him in the photomontage or at trial, the remaining evidence of Olson's guilt does not demonstrate that the jury unjustifiably inferred his guilt from the conflicting defenses alone. Therefore, we hold that Olson fails to establish prejudice, and we hold that the trial court did not abuse its discretion in denying his motion to sever his trial from Emery's.

C. Sufficient Evidence of Alternative Means
¶ 48 Olson next contends that, because sufficient evidence does not support both alternative means of committing first degree robbery and first degree rape, we must reverse and remand for a new trial on only the supported means. The State argues that the subsection of the first degree rape statute relied on at trial does not establish alternative means and that sufficient evidence supported both means of committing first degree robbery presented at trial.
¶ 49 "Criminal defendants in Washington have a right to a unanimous jury verdict." State v. Ortega-Martinez, 124 Wash.2d 702, 707, 881 P.2d 231 (1994); WASH. CONST. art. I, § 21. The right to a unanimous jury verdict includes the right to express jury unanimity on the means by which the defendant committed the crime when alternative means are alleged. Ortega-Martinez, 124 Wash.2d at 707, 881 P.2d 231. "If the evidence is sufficient to support each of *428 the alternative means submitted to the jury, a particularized expression of unanimity as to the means by which the defendant committed the crime is unnecessary to affirm a conviction because we infer that the jury rested its decision on a unanimous finding as to the means." Ortega-Martinez, 124 Wash.2d at 707-08, 881 P.2d 231. "[I]f the evidence is insufficient to present a jury question as to whether the defendant committed the crime by any one of the means submitted to the jury, the conviction will not be affirmed." Ortega-Martinez, 124 Wash.2d at 708, 881 P.2d 231.
¶ 50 RCW 9A.56.200, the first degree robbery statute, provides in pertinent part that
(1) A person is guilty of robbery in the first degree if:
(a) In the commission of a robbery or of immediate flight therefrom, he or she:
(i) Is armed with a deadly weapon; or
(ii) Displays what appears to be a firearm or other deadly weapon.
The statute establishes alternative means of committing first degree robbery. State v. Nicholas, 55 Wash.App. 261, 272-73, 776 P.2d 1385 (1989).
¶ 51 RCW 9A.44.040, the first degree rape statute, provides that
(1) A person is guilty of rape in the first degree when such person engages in sexual intercourse with another person by forcible compulsion where the perpetrator or an accessory:
(a) Uses or threatens to use a deadly weapon or what appears to be a deadly weapon; or
(b) Kidnaps the victim; or
(c) Inflicts serious physical injury, including but not limited to physical injury which renders the victim unconscious; or
(d) Feloniously enters into the building or vehicle where the victim is situated.
Each subsection of this statute establishes alternative means of committing the crime. See State v. Whitney, 108 Wash.2d 506, 507, 512, 739 P.2d 1150 (1987). Olson argues that RCW 9A.44.040(1)(a) establishes alternative "means within a means" of "uses or threatens to use a deadly weapon" and "uses or threatens to use what appears to be a deadly weapon."
¶ 52 But we need not reach the "means within a means" issue of whether both the first degree robbery statute and the first degree rape statute contain alternative means of being armed with or using a "deadly weapon" or "what appears to be a deadly weapon," because sufficient evidence supports both alternatives.
¶ 53 Sufficient evidence supports a conviction if, when viewed in the light most favorable to the State, any rational trier of fact could have found the essential elements of the charged crime beyond a reasonable doubt. State v. Hosier, 157 Wash.2d 1, 8, 133 P.3d 936 (2006). On appeal, we draw all reasonable inferences from the evidence in favor of the State and interpret them most strongly against the defendant. Hosier, 157 Wash.2d at 8, 133 P.3d 936. In the sufficiency context, we consider circumstantial evidence as probative as direct evidence. State v. Goodman, 150 Wash.2d 774, 781, 83 P.3d 410 (2004). We defer to the fact finder on issues of conflicting testimony, witness credibility, and persuasiveness of the evidence. State v. Thomas, 150 Wash.2d 821, 874-75, 83 P.3d 970, abrogated in part on other grounds by Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).
¶ 54 Olson concedes that sufficient evidence supports his conviction under the "what appears to be a deadly weapon" means, but he contests that he was armed with or used an actual firearm. But in State v. Mathe, 35 Wash.App. 572, 580-82, 668 P.2d 599 (1983), aff'd, 102 Wash.2d 537, 688 P.2d 859 (1984) Division One of this court considered whether sufficient evidence proved that Mathe was armed with a firearm in fact when committing his offenses. Although the alleged firearms were never recovered, witnesses described in detail the firearms used during his offenses. Mathe, 35 Wash.App. at 581-82, 668 P.2d 599. Division One held that this circumstantial evidence, when taken in the light most favorable to the State, was sufficient to prove that Mathe was armed with a "real and operable" firearm during his offenses. Mathe, 35 Wash.App. at 581-82, 668 P.2d 599.
*429 ¶ 55 Here, GC described Olson's black, semiautomatic firearm. She described it in further detail by distinguishing a semiautomatic from a revolver and stating that the firearm was not a revolver. As in Mathe, although the firearm in this case was never recovered, sufficient evidence supports that Olson was armed with or threatened to use a real firearm during these offenses. Thus, we hold that, even assuming that both the first degree robbery and first degree rape statutes establish "deadly weapon" and "what appears to be a deadly weapon" as alternative means, sufficient evidence supports both means.

III. STATEMENT OF ADDITIONAL GROUNDS FOR REVIEW
¶ 56 Olson raises additional claims in his SAG. He contends that (1) the trial court erred in allowing the State to file a second amended information before trial because it violated his speedy trial rights and (2) probable cause did not support the search warrant for his residence because the State failed to satisfy the Aguilar-Spinelli[8] test for confidential informants, and the anonymous tip was the only non-stale evidence linking him to the crimes.

A. Amended Information
¶ 57 CrR 2.1(d) allows the State discretion to amend the charging document at any time before verdict or finding as long as the substantial rights of the defendant are not prejudiced. State v. Collins, 45 Wash. App. 541, 551, 726 P.2d 491 (1986). The State may amend the information without arraignment if substantial rights of the defendant are not prejudiced or if the amendment is merely formal. State v. Allyn, 40 Wash.App. 27, 35, 696 P.2d 45 (1985). The defendant bears the burden of demonstrating prejudice. State v. Brisebois, 39 Wash.App. 156, 162, 692 P.2d 842 (1984).
¶ 58 Olson alleges prejudice only by repeating his pretrial arguments that the State's amendment of the information on June 5, 2008, violated his speedy trial rights. He does not provide us with his calculations of his speedy trial time or how the amendment improperly extended the speedy trial time. And the record does not contain the trial court's ruling on this motion. Based on the record before us, Olson's claim fails. To the extent he relies on evidence outside the record, he may file a personal restraint petition. RAP 16.4.

B. Probable Cause for Search Warrant
¶ 59 Two different standards apply to our review of a probable cause determination. The first standard applies to "historical facts" in the case, i.e., the events "`leading up to the stop or search.'" In re Det. of Petersen, 145 Wash.2d 789, 799-800, 42 P.3d 952 (2002) (quoting Ornelas v. United States, 517 U.S. 690, 696, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996)). The trial court or magistrate must first find whether information from confidential informants or anonymous tips has enough reliability and credibility to qualify as historical fact. See Petersen, 145 Wash.2d at 800, 42 P.3d 952. We review these findings for abuse of discretion, giving appropriate deference to the trial court. Petersen, 145 Wash.2d at 800, 42 P.3d 952.
¶ 60 First, to establish probable cause under the Aguilar-Spinelli test for issuance of a search warrant based upon an informant's tip detailed in an affidavit, the affidavit must demonstrate the informant's (1) basis of knowledge and (2) veracity. State v. Vickers, 148 Wash.2d 91, 112, 59 P.3d 58 (2002). If either or both parts of the Aguilar-Spinelli test are deficient, independent police investigation corroborating the informant's tip may satisfy probable cause to the extent it cures the deficiency. Vickers, 148 Wash.2d at 112, 59 P.3d 58.
¶ 61 Olson challenges only the veracity prong. But although Turner's affidavit contained no information about direct indicia of the informant's veracity, independent police investigation corroborated that Olson lived at the address the informant gave, that he and Emery were associates, that he and Emery were suspects in an attempted residential burglary, that the witness to another attempted *430 robbery identified Olson as the assailant, that the victim of that robbery identified both Emery and Olson as her assailants, and that GC identified Emery as one of her assailants. In this way, independent police investigation confirmed the veracity of the witness's tip, thus, linking Olson to the offenses against GC.
¶ 62 Under the second standard, the trial court or magistrate must also "decide the legal issue [of] whether the qualifying information as a whole amounts to probable cause." Petersen, 145 Wash.2d at 800, 42 P.3d 952. We review this legal conclusion de novo. Petersen, 145 Wash.2d at 800, 42 P.3d 952; see also State v. Chamberlin, 161 Wash.2d 30, 40-41, 162 P.3d 389 (2007). "It is only the probability of criminal activity, not a prima facie showing of it, that governs probable cause. The [issuing judge] is entitled to make reasonable inferences from the facts and circumstances set out in the affidavit." State v. Maddox, 152 Wash.2d 499, 505, 98 P.3d 1199 (2004).
¶ 63 The warrant clause of the Fourth Amendment to the United States Constitution and article I, section 7 of our state constitution require that a trial court issue a search warrant on a determination of probable cause. Vickers, 148 Wash.2d at 108, 59 P.3d 58. Probable cause exists where the affidavit sets forth "facts and circumstances sufficient to establish a reasonable inference that the defendant is involved in criminal activity and that evidence of the criminal activity can be found at the place to be searched." Maddox, 152 Wash.2d at 505, 98 P.3d 1199. Thus, "probable cause requires a nexus between [1] criminal activity and the item to be seized, and also [2] a nexus between the item to be seized and the place to be searched." State v. Goble, 88 Wash.App. 503, 509, 945 P.2d 263 (1997).
¶ 64 Here, the affidavit stated that an anonymous tip and independent police investigation linked Emery and Olson to each other and to the offenses against GC. It further stated that (1) the attackers had taken and kept GC's cell phone and (2) the white male suspect had wielded a black semiautomatic handgun and had worn a red baseball cap, purple and yellow "team jacket," and red tee shirt. Thus, the affidavit's facts established a nexus between the offenses against GC and these items listed in the affidavit. Similarly, independent police investigation verified the anonymous informant's tip, including the address of Olson's residence, as described in the affidavit. The trial court could reasonably infer that the white male suspect's clothing or GC's cell phone might be located at his residence. These facts established a nexus between Olson's residence and the items listed in the affidavit. Therefore, the trial court properly concluded that probable cause supported issuance of a search warrant.
¶ 65 We affirm Emery's and Olson's convictions.
We concur: HUNT, J., and WORSWICK, A.C.J.
NOTES
[1] RAP 10.10.
[2] We refer to GC by her initials in order to protect her privacy as a sexual assault victim.
[3] GC described the white male as five feet, nine inches tall; weighing 150 pounds; and having blonde hair. Olson is approximately six feet tall and, at the time of trial, had "dark red" or "orange" hair. RP at 710.
[4] The record contains no indication that the State introduced any evidence seized from Olson's residence at trial.
[5] Emery uses the phrase "mutually exclusive," Br. of Appellant (Emery) at 11, when referring to the nature of his and Olson's defenses, but we believe the more accurate term is "mutually antagonistic." State v. Grisby, 97 Wash.2d 493, 507, 647 P.2d 6 (1982).
[6] We note, however, that even without legitimate strategic reasons for participating in a joint trial, Emery must still demonstrate that the trial court likely would have granted a severance motion and that there was a reasonable probability a jury would have acquitted him in a separate trial. Davis, 152 Wash.2d at 711, 101 P.3d 1.

We review the trial court's decision to proceed with joint or separate trials for manifest abuse of discretion. Grisby, 97 Wash.2d at 507, 647 P.2d 6. Washington law disfavors separate trials. Grisby, 97 Wash.2d at 506, 647 P.2d 6. The trial court should sever the defendants' trials at any point before or during the trials, whenever, it is necessary to achieve "a fair determination of the guilt or innocence of a defendant." CrR 4.4(c)(2)(i), (ii). Trial courts properly grant such severance motions only if a defendant demonstrates that a joint trial would be "so manifestly prejudicial as to outweigh the concern for judicial economy." State v. Hoffman, 116 Wash.2d 51, 74, 804 P.2d 577 (1991).
A "defendant must be able to point to specific prejudice" to demonstrate that the trial court abused its discretion. Grisby, 97 Wash.2d at 507, 647 P.2d 6. "`[A]ntagonistic defenses conflicting to the point of being irreconcilable and mutually exclusive'" may cause specific prejudice. State v. Canedo-Astorga, 79 Wash.App. 518, 528, 903 P.2d 500 (1995) (quoting United States v. Oglesby, 764 F.2d 1273, 1276 (7th Cir. 1985)); see also State v. Jones, 93 Wash.App. 166, 171, 968 P.2d 888 (1998). But mutually antagonistic defenses are not per se prejudicial as a matter of law. Grisby, 97 Wash.2d at 507, 647 P.2d 6.
"The mere existence of antagonism between defenses `or the desire of one defendant to exculpate himself by inculpating a codefendant . . . is insufficient to [compel separate trials].'" Davis, 152 Wash.2d at 712, 101 P.3d 1 (alterations in original) (quoting United States v. Throckmorton, 87 F.3d 1069, 1072 (9th Cir.1996)). Rather, the defendant must demonstrate "`that the conflict is so prejudicial that defenses are irreconcilable, and the jury will unjustifiably infer that this conflict alone demonstrates that both [defendants] are guilty.'" Davis, 152 Wash.2d at 712, 101 P.3d 1 (alteration in original) (quoting Hoffman, 116 Wash.2d at 74, 804 P.2d 577). For defenses to be irreconcilable, they must be "mutually exclusive to the extent that one [defense] must be believed if the other [defense] is disbelieved." State v. McKinzy, 72 Wash.App. 85, 90, 863 P.2d 594 (1993).
In State v. Larry, 108 Wash.App. 894, 911-12, 34 P.3d 241 (2001), we held that attempted murder defenses were not irreconcilable when Varnes, a codefendant, argued that he never formed the intent to kill and that his codefendant, Larry, "call[ed] the shots." Larry admitted that he participated in the crimes, but said that a fourth person was the shooter. Larry, 108 Wash.App. at 912, 34 P.3d 241. We held that these defenses were reconcilable because a jury could believe both Varnes's and Larry's defenses by concluding that neither man was guilty. Larry, 108 Wash.App. at 912, 34 P.3d 241.
Similarly, in State v. Johnson, 147 Wash.App. 276, 284, 194 P.3d 1009 (2008), review denied, State v. Balaski, 165 Wash.2d 1050, 208 P.3d 555 (2009), three codefendants argued that their defenses were mutually antagonistic. Johnson argued that he understood the three intended to commit a burglary at the victim's house, but not murder, and he tried to exculpate himself by testifying against and inculpating his codefendants. Johnson, 147 Wash.App. at 284, 286, 194 P.3d 1009. Codefendant Balaski asserted an alibi defense. Johnson, 147 Wash.App. at 284, 194 P.3d 1009. Finally, codefendant Odell claimed that he drove Johnson and Balaski to the victim's house, but he was unaware of any intention to commit a crime there. Johnson, 147 Wash.App. at 284, 194 P.3d 1009.
We reasoned that, if the jury believed Odell's unwitting participation defense, then it need not have disbelieved Johnson's defense that he planned to participate only in a burglary, not a murder. Johnson, 147 Wash.App. at 287, 194 P.3d 1009. If the jury believed Johnson's defense of ignorance of the murder plan, it was not required to disbelieve that Odell participated unwittingly as the driver. Johnson, 147 Wash.App. at 287, 194 P.3d 1009.
Likewise, we reasoned that if the jury believed Balaski's alibi defense, it did not need to disbelieve Johnson's defense that he did not plan to participate in a murder. Johnson, 147 Wash. App. at 287, 194 P.3d 1009. Conversely, the jury could have believed Johnson without disbelieving that Balaski had an alibi. Johnson, 147 Wash. App. at 287, 194 P.3d 1009. The jury could have simultaneously believed that Johnson only planned to commit a robbery, not a murder; that Odell was the unwitting driver; and that Balaski did not participate in the crimes. Johnson, 147 Wash.App. at 287, 194 P.3d 1009. Finally, we observed that the trial court gave appropriate cautionary jury instructions. Johnson, 147 Wash.App. at 287, 194 P.3d 1009 (citing Grisby, 97 Wash.2d at 509, 647 P.2d 6). Thus, we held that the three defenses were reconcilable, that Johnson's attempt to exculpate himself by inculpating his codefendants did not justify severance, and that the trial court did not err in denying his motion to sever. Johnson, 147 Wash.App. at 287, 194 P.3d 1009.
Here, Emery tried to exculpate himself by casting all blame on Olson. Like Varnes, Emery admitted that he participated in the crime, but he claimed that he participated without criminal intent or awareness of GC's lack of consent. Larry, 108 Wash.App. at 911-12, 34 P.3d 241. Unlike Larry, however, Olson did not admit to participation in the crimes or try to shift blame to another person; he asserted a total alibi defense. Larry, 108 Wash.App. at 911-12, 34 P.3d 241. Thus, if the jury believed Emery's defense that he lacked the intent to rob, kidnap, and rape GC because he thought Olson knew GC, he thought GC was giving them a ride to Olson's house, and he believed there was an agreement for sex based on Olson's statements, then it had to disbelieve Olson's defense that he was not with Emery and did not participate in the crimes. Because Emery's defense was that Olson was present and entirely culpable, while he did not know a crime was being committed, a jury could not believe Emery without disbelieving Olson's alibi defense.
But in order to establish prejudice arising from his counsel's failure to move to sever their trials, Emery must also show that there was a reasonable probability that a jury would have acquitted him in a separate trial. Davis, 152 Wash.2d at 711, 101 P.3d 1. In a separate trial, his lack of criminal intent defense would have to overcome GC's testimony directly implicating him and the evidence corroborating her testimony, including the DNA evidence, the contents of her pockets recovered from where she was abducted, and Gonzalez's testimony, as well as police testimony about GC's hysterical demeanor at Gonzalez's residence and her identification of Emery in the photomontage. The evidence does not demonstrate a reasonable probability of acquittal in a separate trial. Therefore, we hold that Emery fails to establish prejudice and that his ineffective assistance of counsel claim also fails on the merits.
[7] This outcome does not condone the State's continuing usage of the improper arguments in closing, nor does it ignore defense counsel's duty to represent the defendant effectively by making timely objection to improper argument by the State, thereby allowing the trial court to give curative instructions to the jury. In all claims of prosecutorial misconduct, regardless of whether the defendant objects, we analyze the existence and extent of prejudice in the context of the total argument, the issues in the case, the evidence addressed in the argument, and the jury instructions. See Dhaliwal, 150 Wash.2d at 578, 79 P.3d 432.
[8] Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969).