# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON, )
) No. 69172-4-I
Respondent, )
) DIVISION ONE
v. )
) UNPUBLISHED OPINION
RANDALL JOSEPH WHITE, )
)
Appellant. ) FILED: January 21, 2014
)

GROSSE, J. — When a jury is instructed on alternative means of committing a crime, the defendant's right to a unanimous verdict is not violated if substantial evidence supports each charged alternative. Because the State presented substantial evidence that Randall White displayed a knife in a manner that not only warranted alarm for the safety of other persons, but also manifested an intent to intimidate another person, we affirm his conviction for unlawful display of a weapon.

## FACTS

The State charged Randall White with one count of second degree assault while armed with a deadly weapon – domestic violence (count I) and one count of fourth degree assault – domestic violence (count II). At trial, Ericka Peak testified that in March 2012, she and White were living together in Peak's Bellevue house. The couple had been in a relationship for more than five months, and Peak was pregnant with the couple's child.

White spent the afternoon of March 26, 2012, drinking and watching videos. Shortly before 6:30 p.m., he told Peak that he wanted her to cash her

insisted that White return the money in a few days so that she could pay the rent. In response, White became "really agitated" and turned up the volume on the television. When Peak turned the volume down, White threatened to pull the television down from its stand.

As White reached for the television, Peak grabbed him by the shoulders and tried to pull him back. White swung around and hit Peak with his hand. While the two struggled, White's arm obstructed Peak's breathing "for a split second."

White appeared to calm down and went into the kitchen to make something to eat. Peak told White that he could not treat her this way and suggested that he make arrangements to return to Texas. White slapped Peak in the face and then spit on her.

Peak called 911. While she was talking with the 911 operator, White grabbed her cell phone and ran out of the house. As Peak tried to follow White, she encountered Bellevue Police Officer Curtis McIvor, who was responding to the 911 call. McIvor accompanied Peak back to the house. Peak was crying and upset and told McIvor that White had struck her in the face and stomach and spit in her face. McIvor helped Peak secure the house and left after about 45 minutes.

Several hours later, White returned to the house and knocked on the door. Peak let him in because he appeared to have calmed down. White returned

Peak's cell phone but informed her that he would keep the battery until he left for Texas.

White became increasingly agitated as he repeatedly asked Peak what she had said to the police. After about 15 minutes, he went into the kitchen and started throwing food away. White used a knife to open the food packages and eventually cut himself.

After stopping the bleeding, White held the knife while he approached Peak, who was sitting in the living room. As he stood about two to three feet away from her, he began yelling, "[W]hat the fuck did [you] say to the cops?" Peak repeatedly asked White to put the knife down.

While White and Peak were quarreling, a neighbor called 911. As he approached the house, Officer McIvor could see Peak sitting in a chair, with White crouched next to her. Peak was "crying and whimpering," and White was yelling at Peak about why she had called the police.

As the officers forced open the door, White stood up and held Peak against the wall. When White failed to comply with repeated commands to release Peak, the officers grabbed him and forced him to the floor with a taser. After handcuffing White and rolling him over, the officers discovered an open folding knife underneath him.

Peak was still crying, shaking, and visibly distraught after officers removed White from the house. Peak told Officer Thomas Moriarity that White had grabbed her by the shirt and demanded that she "[t]ell [him] every fucking word

3

[she] told to the cops." Peak also told Moriarity that White "was making gestures with the knife" as he yelled at her.

White acknowledged that he spent a few hours drinking in a nearby bar and was "affected" by alcohol when he returned to Peak's house around 10:15 p.m. After Peak let him in, he went into the kitchen to make something to eat. While in the kitchen, White continued to argue with Peak, who was sitting in the living room. At some point, White grabbed a knife and used it to open food packages. When Peak started crying, White, still holding the knife, went over to comfort her and crouched down beside her. He denied threatening Peak with the knife and claimed that he put it down as soon as she mentioned it. White also denied holding Peak against the wall.

The jury found White guilty as charged of fourth degree assault on count II and guilty of the lesser included offense of unlawful display of a weapon on count I. The court sentenced White to concurrent 364-day terms, with credit for 115 days served and the remainder of the sentence suspended.

## ANALYSIS

White contends that the "to convict" instruction for the lesser included offense of unlawful display of a weapon (count I) specified two alternative means. He argues that the State presented sufficient evidence to support only one of the alternative means and that the conviction therefore violated his constitutional right to a unanimous jury.

Criminal defendants in Washington have a constitutional right to a unanimous jury verdict.[1] When the crime charged can be committed by more than one means, however,

> the defendant does not have a right to a unanimous jury determination as to the alleged means used to carry out the charged crime or crimes should the jury be instructed on more than one of those means. . . . But, in order to safeguard the defendant's constitutional right to a unanimous verdict as to the alleged crime, substantial evidence of each of the relied-on alternative means must be presented.[2]

Whether a statute sets forth alternative means of committing the offense depends on legislative intent.[3] There are no bright-line rules for determining alternative means, and the courts must evaluate each case "'on its own merits.'"[4] The mere use of a disjunctive phrase in an instruction or statute does not automatically trigger a substantial evidence review.[5]

Here, in order to establish lesser included offense of unlawful display of a weapon, the State was required to prove, among other things, that White displayed the knife

---

[1] State v. Ortega-Martinez, 124 Wn.2d 702, 707, 881 P.2d 231 (1994); WASH. CONST. art. I, § 21.
[2] State v. Smith, 159 Wn.2d 778, 783, 154 P.3d 873 (2007) (citation omitted).
[3] State v. Arndt, 87 Wn.2d 374, 378, 553 P.2d 1328 (1976).
[4] State v. Peterson, 168 Wn.2d 2d 763, 769, 230 P.3d 588 (2010) (quoting State v. Klimes, 117 Wn. App. 758, 769, 73 P.3d 416 (2003)).
[5] Smith, 159 Wn.2d at 783.

in a manner, under circumstances, and at a time and place that manifested an intent to intimidate another or warranted alarm for the safety of other persons.[6]

White concedes that the evidence of his confrontation with Peak supported an inference that he displayed the knife in a manner that warranted alarm for the safety of others, but asserts the evidence did not manifest "an intent to intimidate another."

Relying on the "invited error" doctrine, the State contends that White cannot challenge the sufficiency of the evidence on appeal because he proposed the instruction containing the alternative means.[7] But we need not address this dubious proposition nor the State's alternative claim that unlawful display of a weapon is not an alternative means crime because the evidence was sufficient, in any event, to support both of the alleged alternative means.[8]

Several hours after assaulting Peak, White returned to her house, clearly still angry because she had called the police. White gave Peak her cell phone, but kept the battery, rendering the phone useless. He repeatedly interrogated Peak about what she had told the police and then went into the kitchen, where he grabbed a knife to open food packages. Eventually, White returned to the living room to confront Peak again. While still holding the knife in his hand, White repeatedly demanded to know, "[W]hat the fuck did [you] say to the cops," and

---

[6] Jury Instruction 15 (emphasis added); see also RCW 9.41.270(1).

[7] See State v. Boyer, 91 Wn.2d 342, 344-45, 588 P.2d 1151 (1979) (under invited error doctrine, a party may not request an instruction and then complain on appeal that the requested instruction was given).

[8] See State v. Emery, 161 Wn. App. 172, 199, 253 P.3d 413 (2011).

"Tell me every fucking word you told to the cops." Peak told Officer Moriarity that White "was making gestures with the knife," while he was yelling in her face.

Viewed in the light most favorable to the State, the foregoing circumstances were sufficient to permit a rational trier of fact to find beyond a reasonable doubt that White displayed the knife in a manner that manifested "an intent to intimidate another." The evidence was therefore sufficient to support his conviction.

Affirmed.

WE CONCUR:

7