IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| THE STATE OF WASHINGTON, | ) | No. 76423-3-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| DANIEL LEYVA-ABITIA, | ) | |
| | ) | |
| Appellant. | ) | FILED: February 25, 2019 |

SCHINDLER, J. — Daniel Leyva-Abitia seeks reversal of the jury conviction on two counts of child molestation in the first degree of L.C. Leyva-Abitia argues (1) prosecutorial misconduct, (2) improper opinion testimony, and (3) cumulative error denied him the right to a fair trial. We reject his arguments and affirm the jury convictions.

## FACTS

L.C. was born on September 8, 2005. Her mother L.B. struggles with drug addiction and was in and out of prison "throughout [L.C.]'s life." When L.B. was incarcerated, L.B.'s grandmother S.C. took care of L.C.

In 2011, L.C. lived in a two-bedroom apartment in Federal Way with L.B., L.B.'s mother, and L.B.'s grandmother S.C. L.B. was involved in a romantic

relationship with a man named "Jose."[1] Jose lived in a house in Federal Way with Salinas Leyva-Abitia and his brother Daniel Leyva-Abitia.

In 2011, 50-year-old Daniel Leyva-Abitia stayed in the basement of his brother Salinas'[2] house for three or four months before moving to the house next door and renting the upstairs to a woman named "Norma"[3] and her two children. Leyva-Abitia lived in the basement. The basement was accessible only through an exterior door.

Between 2011 and 2013, L.B. went to either Salinas' house or Daniel Leyva-Abitia's house two to three times a week to spend time with Jose and her friends, including Daniel Leyva-Abitia. L.B. often took L.C. with her. L.B. would leave L.C. with Daniel Leyva-Abitia and "go off upstairs to Norma's" or go next door to Salinas' house.

Daniel Leyva-Abitia started sexually molesting L.C. when she was approximately six-years-old. Leyva-Abitia told L.C. "not to tell anybody." Leyva-Abitia told L.C., "I do this to everyone. . . . I do it to your grandma. I do it to your mom too" and her friends. L.C. did not tell anyone about the sexual molestation. L.C. thought "everyone else knew, because supposedly it was going on to everyone else."

In 2013, Leyva-Abitia left Washington to return to California. After watching a television show, L.C. learned that what Leyva-Abitia "did to me" was wrong—"finally, I figured out and I was shocked."

---

[1] Because the record does not contain Jose's full name, we refer to him by his first name only.

[2] We refer to Salinas Leyva-Abitia by his first name for clarity.

[3] Because the record does not contain Norma's full name, we refer to her by her first name only.

Leyva-Abitia moved back to Washington at the end of 2014. One night between late February and early March 2015, L.B. took nine-year-old L.C. with her to visit Daniel Leyva-Abitia. After approximately 30 minutes, L.B. left L.C. with Leyva-Abitia while she went outside to talk to friends. Leyva-Abitia asked L.C. to go down to the basement and "help him find a flashlight." Leyva-Abitia tried to touch L.C. while they were in the basement. L.C. did not "want him touching [her] like he had in the past." L.C. ran upstairs and went outside to find her mother. L.C. was "anxious" and told her mother she wanted to leave because Leyva-Abitia "wanted to go downstairs with her." L.C. told L.B. she was "scared" of Leyva-Abitia, "something bad had happened in the past," and she "did not want to be there anymore." L.B. said she was "shock[ed]."

> It was a shock, because she had never mentioned anything before about anybody there, about being scared or anybody doing anything bad to her. So it was kind of — like, it was a surprise.

The next day, L.C. told her grandmother and her great-grandmother S.C. that Daniel Leyva-Abitia had molested her. L.B. reported the abuse to the police.

On March 5, 2015, Federal Way Police Officer Tanner Pau interviewed L.B. for approximately 20 minutes. L.B. provided a written statement. Officer Pau spoke very briefly to L.C. Officer Pau forwarded his report and L.B.'s statement to Detective Raymond Unsworth. Detective Unsworth scheduled a forensic child interview with King County Prosecuting Attorney child interview specialist Carolyn Webster.

Webster interviewed L.C. on March 13, 2015. The interview was video recorded. L.C. said Leyva-Abitia first started touching her in the basement where

he lived with his brother Salinas when she was about six-years-old. L.C. told Webster, "The first time I ever went" to Salinas' house, Leyva-Abitia "started doing it." L.C. said Leyva-Abitia continued to touch her when he lived in the basement of the rental house he shared with Norma. L.C. described the basement where Leyva-Abitia lived as "very, very small" with a "bed, the couch," and an "electrical . . . stove."

L.C. told Webster that Leyva-Abitia would "try to teach me how to kiss so I could kiss him."

| | |
|---|---|
| CFI[4] C. WEBSTER: | Okay and when you say you didn't know what he was doing what do you mean? |
| L. [C.]: | Like I didn't know like what he was doing like when, when he was touching me. |
| CFI C. WEBSTER: | Okay. |
| L. [C.]: | Or like trying to kiss me I didn't know what he was doing. |
| CFI C. WEBSTER: | Okay, okay and you said something about when he tried to kiss you? |
| L. [C.]: | Yeah, he would try to kiss me. |
| CFI C. WEBSTER: | Tell me about that? |
| L. [C.]: | He would, uh, when my mom was over at the next house at her friends['] he would try to teach me how to kiss so I could kiss him. |
| CFI C. WEBSTER: | So tell me about a time he tried to teach you how to kiss tell me about that? |
| L. [C.]: | He was kissing me. |
| CFI C. WEBSTER: | Uhmm. |
| L. [C.]: | And, uh, but like he would put his tongue in my mouth. |
| CFI C. WEBSTER: | Okay. |
| L. [C.]: | And I didn't really like that and I would ask him if [he] would stop and then but he didn't never stopped. |
| CFI C. WEBSTER: | How do you know he was trying to teach you how to kiss? |
| L. [C.]: | Because he said here let me teach you how to kiss. |

---

4 Child forensic interviewer.

CFI C. WEBSTER:    Okay.
L. [C.]:    He specifically told me.

L.C. said in the beginning, Leyva-Abitia would "kiss my cheek" and "rub me all over the place . . . on the outside of my clothes." But after "one or two years he started doing it in the inside and on the outside of my clothes." L.C. told Webster that Leyva-Abitia rubbed her "bottom and the private."

L.C. said Leyva-Abitia "would unzip" his pants and "want me to touch his private part . . . . He would grab my hand" and "make me put it around his private" and "make me like rub it . . . . [L]ike you were shaking something." L.C. described Leyva-Abitia's "private part" as "hairy." L.C. said "the white stuff" that came out "looks like this liquid thing that looks like medicine. . . . [I]t was like little pieces of white things and then it was like, like white liquid. . . . It was . . . grayish." L.C. told Webster that Leyva-Abitia "would tell me to go grab a towel . . . so he could wipe it up." L.C. said Leyva-Abitia did not kiss and touch her "for . . . long because my mom wouldn't be away for a long time." L.C. told Webster that "maybe two times" Leyva-Abitia "put [his private] inside my bottom."

L.C. said Leyva-Abitia touched her or made her touch him while they were in his car.

> [I]t would, also, happen in the car. He would, I would be in the back seat and he would be putting his hand like around the seat to touch me. . . . My legs and he would go up my legs. . . . And then he would stop when it was the point where he couldn't reach anymore. . . . [H]e would make me sit in the front seat and do the same thing to his private part. . . . [T]ouch his private part . . . when he was driving. . . . [H]e would unzip his pants . . . and put it out. . . . The same thing the white stuff . . . would come out.

L.C. said that "when it was a red light and everybody could see," Leyva-Abitia

5

would tell her to "stop." "[H]e would grab my hand" and "zip up his pants" "because he didn't want other people to see what I, he was making me do."

L.C. told Webster that Leyva-Abitia "always" locked the basement door. L.C. said when someone knocked on the door, Leyva-Abitia "stopped and, uh, he pulled back—he told me to pull back up my pants." No one ever asked "why the door was locked." L.C. said the last time Leyva-Abitia touched her was a "few days before" he left Washington in 2013.

The State charged Leyva-Abitia with two counts of child molestation in the first degree of L.C. between September 8, 2010 and September 7, 2012. Leyva-Abitia pleaded not guilty.

Several witnesses testified at trial, including child interview specialist Webster, Officer Pau, Detective Unsworth, 11-year-old L.C., great-grandmother S.C., L.B., and Leyva-Abitia. A Spanish interpreter assisted Leyva-Abitia throughout the trial.

Webster testified about the March 2015 interview with L.C. After Webster testified, the court admitted the video and audio recording of the forensic child interview with L.C. into evidence. The State played the videotaped recording of the interview for the jury.

L.C. testified that Leyva-Abitia touched her in the basement of "Salinas' house" and in the basement of "Norma's house." L.C. said it "would happen less" in the basement of Salinas' house "because there was more people there." L.C. testified that the entrance to the basement in Salinas' house was "inside" the house but the entrance to the basement of the house Leyva-Abitia shared with

Norma was "on the outside" of the house. L.C. described the basement in Leyva-Abitia's house as "[t]he walls were, like, cement, hard, and the floors were too. Like there was a bed, there was like — there was the washer and dryer. And then there was like a place for like a — like a stove that you could plug in."

L.C. testified Leyva-Abitia sexually molested her in the basement of his house "too many [times] to tell." L.C. said sometimes Leyva-Abitia kissed her and "stuck his tongue in my mouth." L.C. said Leyva-Abitia touched her breast area "in between my shoulders and my stomach."

L.C. testified that when she tried to "push him away," Leyva-Abitia would "grab me by my hair and pull me back." He would "pull down my pants, or like stick his hand in my pants or shorts or shirt." L.C. said he "rubb[ed]" her "private part with his hand." L.C. said Leyva-Abitia would "lick" her leg.

> [I]f I was only wearing a skirt, like a dress, he would, like, start from like my ankle or something and lick all the way up my leg and so he gets to my private part. But then I would like push his head away.

L.C. testified that Leyva-Abitia would unzip his pants, pull out his "private part," and "grab my hand and make me touch his private part." L.C. said Leyva-Abitia "would make my hand go up and down. He wouldn't, like, just let go of my hand." L.C. described Leyva-Abitia's penis as a "hairy" "round bar." L.C. said a "clear . . . but like blurry" substance came out of his "private part." L.C. testified that Leyva-Abitia "would wipe it up with a towel" or tell her to "go grab the towel before your mom comes back."

L.C. said Leyva-Abitia touched the "inside of [her] bottom" with "his private part." L.C. testified that she felt "uncomfortable" and told him, "Ow" or, "Stop."

7

L.C. said Leyva-Abitia "[r]arely" stopped and would "[p]ull my hair" and say, "Quiet, or Shut up."

L.C. testified that Leyva-Abitia touched her when they were in his car. If she was sitting in the back seat, Leyva-Abitia would reach back and "try to rub his hands on my private part." L.C. said she tried to "hide my legs" and "get away from his hand . . . [b]ecause I knew he was going to do something wrong." If she was in the front passenger seat, Leyva-Abitia would "grab my hand and pull it over to touch his private part or . . . stick my hand inside his pants." L.C. said Leyva-Abitia kept "his private on the inside" of his pants "so no one driving by could see." L.C. testified that Leyva-Abitia would "buy me stuff" at the store "[l]ike toys or, like, clothes or, like, slippers."

L.C. said she "realize[d] that what he was doing wasn't okay" after watching crime television shows. L.C. said while her great-grandmother S.C. was asleep," "I would watch them, and I kind of started to figure out what was going on. And I'm like, Oh, shoot, that is going on."

L.C. said that after Leyva-Abitia returned to Washington, he "tried to make me come into the basement with him" again. L.C. testified she left and went outside to tell her mother that Leyva-Abitia had molested her in the past:

> I whispered in her ear, and [Leyva-Abitia] was standing right there by the car. And I'm like, hopefully he doesn't hear. So I was trying to whisper very, very quietly that [he]'s molesting me. And then I think he heard, because he went and ran up. He's like, What did you tell your mom? I'm like, Oh, nothing. Oh, that I need to take a shower when I get home. And then he's like, Oh, okay. And then he went down in his basement.

S.C. testified that she took care of L.C. when L.B. was incarcerated. S.C. said Daniel Leyva-Abitia and L.B. were friends and she met him "two or three" times. S.C. testified that she and L.C. watched a "crime show" television program called "Investigation Discovery."

L.B. testified she dated Jose for about "three years" beginning in approximately 2011. L.B. said L.C. spent time alone with Daniel Leyva-Abitia in the basement of his house when she went "over to the other house for a short period of time" or ran "errands." L.B. said the exterior basement door was always locked and she would have to knock. L.B. said, "[I]f you didn't lock it from the inside, it wouldn't close properly." L.B. testified she "didn't notice anything unusual" when L.C. spent time with Leyva-Abitia in the basement and L.C. "never acted like anything was wrong."

L.B. testified that when Leyva-Abitia left for California, she continued to bring L.C. with her to visit friends at Salinas' house and Norma's house. But when L.B. took L.C. with her to visit Daniel Leyva-Abitia in 2015, L.C. insisted on leaving. L.C. told L.B. she was "scared of him" and he had sexually molested her.

L.B. testified that L.C. never "said that anyone but [Daniel Leyva-Abitia] made her uncomfortable" or "scared" and never "expressed concern about spending time alone with anyone but [Daniel Leyva-Abitia]." On cross-examination, L.B. admitted Jose kept "pornographic material" in his room at Salinas' house.

Daniel Leyva-Abitia testified L.B. often came to visit and "would bring her daughter" with her. Leyva-Abitia denied "ever inappropriately touch[ing]" L.C. Leyva-Abitia said he could not "recall a specific time where" he was "alone with [L.C.] in the basement." Leyva-Abitia admitted he drove L.C. and L.B. to "places" like "the store at the corner" but he was "[n]ever" alone with L.C. in the car.

On cross-examination, Leyva-Abitia testified that Norma and her family lived upstairs and he lived in the basement of the house. Leyva-Abitia described the basement as "one big, open room" with "my TV[5] set, my table, a couple of arm chairs or couches, and a little stove where I cooked." Leyva-Abitia said he could only "access" the basement "from the outside." Leyva-Abitia testified, "I wouldn't allow people to come into my bedroom. . . . Nobody got to come into [my] bedroom."

During closing argument, defense counsel asserted Leyva-Abitia did not inappropriately touch L.C. Defense counsel argued L.C. also spent time with Jose and she could "get these ideas" from the pornography Jose kept in his room. Defense counsel conceded there was "no evidence" L.C. saw the pornography, "[b]ut it's certainly possible" and "might explain a lot."

The jury found Leyva-Abitia guilty of two counts of child molestation of L.C. in the first degree. The court imposed a concurrent sentence at the high end of the standard sentencing range. The court ruled Leyva-Abitia "has consistently denied these charges" but the evidence is "very compelling."

> As [the prosecutor] point[s] out in her closing argument, there was testimony from [L.C.] that was very difficult to reconcile with Mr. Leyva-Abitia's protestations of innocence. She was able to

---

5 Television.

describe his room in the basement, despite his testimony that she had never been down there with him. There was never any information or evidence that would provide a motive for fabrication of these allegations. And given [L.C.]'s testimony about these incidents being — I can't remember her exact words, but it was something along the lines of too many times to remember. It's pretty clear that although the [S]tate chose to charge Mr. Leyva-Abitia with two counts of child molesting, and the jury found him guilty of those two counts, there were a number of other incidents that would have supported additional counts.

Given all of that, I feel compelled to impose the high end of the standard range sentence that the [S]tate is requesting in this case. So I will impose a sentence of 89 months on each count to run concurrently with one another.

## ANALYSIS

### Prosecutorial Misconduct

Leyva-Abitia contends prosecutorial misconduct during opening statement and closing argument and in cross-examination violated his constitutional right to a fair trial.

"The right to a fair trial is a fundamental liberty secured by the Sixth and Fourteenth Amendments to the United States Constitution and article I, section 22 of the Washington State Constitution." In re Pers. Restraint of Glasmann, 175 Wn.2d 696, 703, 286 P.3d 673 (2012).

We review allegations of prosecutorial misconduct for abuse of discretion. State v. Lindsay, 180 Wn.2d 423, 430, 326 P.3d 125 (2014). To prevail on a claim of prosecutorial misconduct, the defendant must "show that in the context of the record and all of the circumstances of the trial, the prosecutor's conduct was both improper and prejudicial." Glasmann, 175 Wn.2d at 704; State v. Thorgerson, 172 Wn.2d 438, 442, 258 P.3d 43 (2011). A defendant establishes

prejudice if there is a substantial likelihood the misconduct affected the jury's verdict. State v. Emery, 161 Wn. App. 172, 192, 253 P.3d 413 (2011).

Opening Statement and Closing Argument

For the first time on appeal, Leyva-Abitia contends the prosecutor committed misconduct during opening statement and closing argument by telling the jury Leyva-Abitia was a "predator" and the jury should protect "marginalized communities."

During opening statement, a prosecutor "may state what the State's evidence is expected to show." State v. Magers, 164 Wn.2d 174, 191, 189 P.3d 126 (2008). In closing argument, prosecutors have "wide latitude to argue reasonable inferences from the evidence." Thorgerson, 172 Wn.2d at 448. We review alleged prosecutorial misconduct in opening statement and closing argument in the context of the total statement or argument, the evidence presented, and the instructions given to the jury. State v. Monday, 171 Wn.2d 667, 675, 257 P.3d 551 (2011). In closing argument, "[p]rosecutors are free to argue their characterization of the facts presented at trial and what inferences these facts suggest." In re Pers. Restraint of Phelps, 190 Wn.2d 155, 167, 410 P.3d 1142 (2018).

Leyva-Abitia did not object to the statements in opening or the remarks in closing argument that he challenges for the first time on appeal. If the defendant does not object at trial, any error is waived unless the conduct is "so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." State v. Emery, 174 Wn.2d 741, 760-61, 278 P.3d 653 (2012).

Under this "heightened standard," the defendant must show "(1) 'no curative instruction would have obviated any prejudicial effect on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.' " Emery, 174 Wn.2d at 761 (quoting Thorgerson, 172 Wn.2d at 455). When evaluating whether misconduct is flagrant and ill intentioned, we "focus less on whether the prosecutor's misconduct was flagrant or ill intentioned and more on whether the resulting prejudice could have been cured." Emery, 174 Wn.2d at 762. In Phelps, the Washington Supreme Court notes:

> We have found prosecutorial misconduct to be flagrant and ill intentioned in a narrow set of cases where we were concerned about the jury drawing improper inferences from the evidence, such as those comments alluding to race or a defendant's membership in a particular group, or where the prosecutor otherwise comments on the evidence in an inflammatory manner. See [ ]Monday, 171 Wn.2d [at] 667[ ]; State v. Belgarde, 110 Wn.2d 504, 508, 755 P.2d 174 (1988) (holding a prosecutor committed flagrant and ill-intentioned misconduct by telling the jury the defendant in a murder trial was " 'strong' " with the American Indian Movement (AIM) and calling AIM a " 'deadly group of madmen' " and " 'butchers that kill indiscriminately' "); Glasmann, 175 Wn.2d at 701-02 (holding it was flagrant and ill-intentioned misconduct for a prosecutor to present slides of the defendant's booking photograph with words like " 'GUILTY' " and " 'WHY SHOULD YOU BELIEVE ANYTHING HE SAYS ABOUT THE ASSAULT?' " superimposed over the photograph in bold red letters).

Phelps, 190 W.2d at 170-71.

Leyva-Abitia argues the prosecutor's use of the word "predator" and urging the jury to protect "marginalized communities" is a flagrant and inflammatory appeal to the passion and prejudice of the jury. The State argues Leyva-Abitia takes out of context and misconstrues the prosecutor's statements in opening and closing argument, the statements are based on reasonable

13

inferences from the evidence, and Leyva-Abitia cannot show the statements were so flagrant and ill intentioned that a curative instruction could not have neutralized any prejudice. The record supports the State's argument.

At the beginning of opening statement, the prosecutor states:

> Predators carefully pick their victims. They pick the young, vulnerable, the alone. People they believe don't have the strength, the courage or the support to stick up for themselves. People that they gamble won't tell. In this way people in the most marginalized communities become easy targets. The children of marginalized communities, the easiest target.
> Who better to pick than a child whose guardians are drug addicted, in and out of her life, or too old to properly care for a girl. This child is perfect. Because as she's experienced her life in this way, as she suffers through abuse, who is vigilant enough to know this? And who is vigilant enough to step in? Who cares enough about her to believe her?

At the beginning of closing argument, the prosecutor argued:

> Predators carefully pick their victims. They pick the young. They pick the vulnerable. The quiet. Those who don't have the apparent strength, or courage, or support to speak up. In this way, people in our most marginalized community become victims.
> Who better to pick than a child whose mom is upstairs smoking meth[amphetamine]. The child who[se] mom brings her to the house to have some semblance of a social life and free time. So she can party with friends and leave her daughter in the hands of people like Mr. Leyva-Abitia.
> She's the perfect victim actually. She doesn't have the support of someone who's paying close attention to her, who's monitoring, who's watching her. She is young. She's easy to manipulate. She's easy control.
> [L.C.], from the minute she went into that house, the minute her mom left her alone with Mr. Leyva-Abitia, she was a moving target. And Mr. Leyva saw this and he capitalized. He took advantage of a five year, six year old, seven year old little girl to do what he wanted when he wanted it, on his time frame. Without any consideration about how it might affect her, how it might damage her.
> You know what? He took a gamble. He gambled that even if this little girl says something, no one's going to be listening. Even if this little girl says something, no one's going to care. Even if this

little girl says something, no one will believe her. He was wrong about one thing. He was wrong that [L.C.] didn't have the strength or the courage to stand up for herself. He was wrong that that little girl was going to keep her mouth shut forever. And he was wrong that no one was going to care.[6]

Leyva-Abitia contends the prosecutor improperly appealed to the passion and prejudice of the jury by portraying him as a "predator." A prosecutor should not use arguments calculated to inflame the passion or prejudice of the jury. Glasmann, 175 Wn.2d at 704. Arguments that are intended to provoke fear, anger, or a desire for revenge or that are irrelevant, irrational, or inflammatory are improper appeals to passion or prejudice. In re Pers. Restraint of Cross, 180 Wn.2d 664, 724-25, 327 P.3d 660 (2014), abrogated on other grounds by State v. Gregory, 192 Wn.2d 1, 427 P.3d 621 (2018).

Leyva-Abitia's comparison to the improper closing argument in State v. Rivers, 96 Wn. App. 672, 981 P.2d 16 (1999), and Belgarde is unpersuasive.

Rivers does not suggest that use of the term "predator" is per se misconduct. In Rivers, the prosecutor argued the defendant was " 'a vicious rocker' " and "part of a pack" of " 'predators,' " and that the defendant and others were " 'nothing more than hyenas.' " Rivers, 96 Wn. App. at 673. The prosecutor called the defendant a " 'jackal' " and read the dictionary definition to the jury. Rivers, 96 Wn. App. at 673. We reversed because the "ill-conceived rhetoric" was unrelated to the evidence and improper. Rivers, 96 Wn. App. at 675-76.

---

[6] Leyva-Abitia also argues the prosecutor improperly asked the jury to "care" enough about L.C. to "believe her." But as the State points out, the prosecutor is referring to the disclosures L.C. made to her great-grandmother and her mother and that they cared enough to report the crime.

In Belgarde, the prosecutor described the American Indian Movement as a " 'deadly group of madmen' " comparable to " 'Sean Finn' " or " 'Kadafi—feared throughout the world.' " Belgarde, 110 Wn.2d at 506.[7] The prosecutor suggested the jury consider Wounded Knee:

> I remember Wounded Knee, South Dakota. Do any of you? It is one of the most chilling events of the last decade. You might talk that over once you get in there. That was the American Indian Movement. That was a faction of the American Indians that were militant, that were butchers, that killed indiscriminately.

Belgarde, 110 Wn.2d at 507.[8] The court reversed on the grounds that the flagrant and highly prejudicial statements were "inflammatory comments" that "introduced 'facts' not in evidence" and were designed to "appeal to the jury's passion and prejudice and encouraged it to render a verdict based on" the defendant's "associations with AIM." Belgarde, 110 Wn.2d at 512, 507-08.

It is improper for a prosecutor to ask a jury to return a verdict to " 'send a message' " or to act as a conscience to the community. State v. Ramos, 164 Wn. App. 327, 338, 263 P.3d 1268 (2011) (quoting United States v. Solivan, 937 F.2d 1146, 1153 (6th Cir. 1991)); State v. Thierry, 190 Wn. App. 680, 690, 360 P.3d 940 (2015); State v. Powell, 62 Wn. App. 914, 918-19, 816 P.2d 86 (1991); State v. Bautista-Caldera, 56 Wn. App. 186, 195, 783 P.2d 116 (1989). Unlike the cases cited by Leyva-Abitia, the prosecutor did not urge the jury to send a message, protect the community, or protect future victims.

We reject Leyva-Abitia's argument that use of the term "predator" required expert testimony. In Phelps, the Washington Supreme Court concluded the

---

[7] Emphasis omitted.
[8] Emphasis omitted.

16

"concept of grooming, as used in this case, is within the common knowledge of jurors and the State was not required to present expert testimony to argue grooming to the jury." Phelps, 190 Wn.2d at 170.[9]

The prosecutor's statement that predators prey on victims in marginalized communities and that children in marginalized communities "become easy targets" is a reasonable inference from the evidence. The undisputed evidence established L.B. has a long-time drug addiction. The evidence showed Leyva-Abitia took advantage of L.C.'s vulnerability and lack of supervision by repeatedly sexually abusing her over the course of two years.

Here, as in Bautista-Caldera, the prosecutor twice told the jury to "fully, fairly, and carefully consider all of the evidence" in making its decision. The court also instructed the jury that closing arguments are not evidence.[10] See Phelps, 190 Wn.2d at 172. We presume jurors follow the court's instructions. Phelps, 190 W.2d at 172.

Even if use of the term "predator" and the argument that Leyva-Abitia took advantage of a young child from a marginalized community were improper, Leyva-Abitia cannot overcome the burden of proving any misconduct was so flagrant and ill intentioned that a timely objection and curative instruction could

---

[9] We reject Leyva-Abitia's effort to overcome the lack of objection to the prosecutor's statements in opening and closing argument by recharacterizing the issue as ineffective assistance of counsel for failing to object. See State v. Fisher, 165 Wn.2d 727, 756 n.8, 202 P.3d 937 (2009).

[10] Jury instruction 1 states, in pertinent part:

The lawyers' remarks, statements, and arguments are intended to help you understand the evidence and apply the law. It is important, however, for you to remember that the lawyers' statements are not evidence. The evidence is the testimony and the exhibits. The law is contained in my instructions to you. You must disregard any remark, statement, or argument that is not supported by the evidence or the law in my instructions.

not have obviated any prejudice. Defense could have objected either in opening statement or in closing argument and at that point, the court could have sustained an objection and instructed the jury to disregard the improper comments.

<u>Cross-Examination</u>

Leyva-Abitia contends the prosecutor committed misconduct in cross-examination by asking him irrelevant and argumentative questions about the testimony of L.C.

During cross-examination, Leyva-Abitia testified that he had "a bed, a TV, a table, a couch, a little stove plugged in," and "a washer and dryer" when he lived in the basement of his rental house. The prosecutor asked how Leyva-Abitia could reconcile his testimony that "you never allowed anyone in your room" in the basement with L.C.'s testimony that "described your bedroom." The court sustained the defense objection. The court stated, "I don't think it's appropriate to ask a witness to explain the testimony of another witness or to explain why another witness gave such testimony."

The prosecutor then asked Leyva-Abitia why L.C. would say that he sexually abused her "out of the blue."

> Q.  (By [the prosecutor]) Now, you testified that you and — you had a fine, nonargumentative relationship with both [L.B.] and [L.C.]. Do you remember? Is that —
> A.  Yes.
> Q.  But all of a sudden [L.C.] says that you have sexually abused her, right?
> A.  That's what she says.
> Q.  Just totally out of the blue.

Defense counsel objected as speculative. Counsel suggested the prosecutor "rephrase the question" because "out of the blue" is an idiom.

> THE COURT:     So you're asking Mr. Leyva whether these accusations from his standpoint came out of the blue? I'll allow that.
> Q.     (By [the prosecutor])  Out of the blue?
> [DEFENSE COUNSEL]:     Can you ask her to rephrase the question?
> THE COURT:     It may not —
> [DEFENSE COUNSEL]:     Whether — she's trying to get at whether it was a surprise to him.
> THE COURT:     It may not translate well. It's kind of a strange idiom.

The prosecutor then engaged in the following exchange with Leyva-Abitia using the word "surprise":

> Q.     (By [the prosecutor])  This was a surprise to you? He had a normal relationship with this little girl and then this accusation comes out and it's a surprise to you?
> A.     It is something that surprises you.
> Q.     Did it surprise you that she was able to describe ways in which you touched her body?
> A.     Of course it surprises me, because she never did.
> Q.     Did it surprise you that she was able to describe certain ways you positioned her body down in your basement?
> A.     Of course it surprises me, because it did not happen.
> Q.     Does it surprise you that she was able to describe the ways in which you touched her in your small, dark four-door vehicle?
> A.     Of course it surprises me, because it did not happen. It did not happen.

When the prosecutor asked Leyva-Abitia, "Does it surprise you that she was able to describe the way your penis looks and the way your penis looked when you would ejaculate," defense counsel objected, "[H]ow is whether he is surprised relevant at all."

> [PROSECUTOR]:     This is cross exam. This goes to state of mind. It's not a direct examination. There's a difference.

[DEFENSE COUNSEL]: How is it relevant whether he's surprised or not?

THE COURT: I'm not sure it is relevant.

[PROSECUTOR]: It goes to the veracity of the charge, Your Honor, if he were to say no, that doesn't surprise me, because there's a different issue going on, a different way that we discuss different mannerisms (inaudible/coughing) interaction, and I don't see how his state of mind about these accusations is not relevant.

The court told the prosecutor, "[M]ove to a different line of questions."

[PROSECUTOR]: Is he able to answer that last one?

THE COURT: He can answer that last one.

Q. (By [the prosecutor]) You can answer it.

A. Would you repeat the question, please?

Q. Sure. Does it surprise you that she was able to describe the way your penis looked when you ejaculated?

A. Of course it surprises me, because that never happened.

Q. A 9 year old girl?

A. I'm sorry, could you repeat that?

Q. A 9 year old girl?

[DEFENSE COUNSEL]: Is there a question, Your Honor?

Q. (By [the prosecutor]) No, you are stating that you never — you know, that you were never alone in your car with [L.C.]. Is that your testimony?

A. Never alone with her.

We review evidentiary rulings and allegations of prosecutorial misconduct for abuse of discretion. State v. Ish, 170 Wn.2d 189, 195, 241 P.3d 389 (2010).

Asking a witness to express an opinion or comment on whether another witness is lying is improper and invades the province of the jury. State v. Montgomery, 163 Wn.2d 577, 591, 183 P.3d 267 (2008).[11] In the context of the entire record and the circumstances at trial, we conclude Leyva-Abitia cannot

[11] We reject the State's argument that the invited error doctrine precludes Leyva-Abitia from arguing prosecutorial misconduct on cross-examination. The record shows an interpreter was present throughout trial. The defense attorney objected but suggested using "surprise" instead of the idiom "out of the blue."

show a substantial likelihood that prosecutorial misconduct affected the jury's verdict. Thorgerson, 172 Wn.2d at 442; Emery, 161 Wn. App. at 192.

Leyva-Abitia adamantly denied sexually molesting L.C. in the basement of his house or in the car. In response to each of the questions on cross-examination, Leyva-Abitia unequivocally testified, "Of course it surprises me, because it did not happen." Because the responses were consistent with Leyva-Abitia's denial that he committed child molestation, Leyva-Abitia cannot show prejudice.

Demeanor Testimony

For the first time on appeal, Leyva-Abitia claims the testimony of Officer Pau and Detective Unsworth is impermissible opinion testimony about the demeanor of L.C. and her mother L.B.

"A witness may not give, directly or by inference, an opinion on a defendant's guilt." State v. Smiley, 195 Wn. App. 185, 189, 379 P.3d 149 (2016). But testimony that is based on inferences from the evidence, does not comment directly on the defendant's guilt or on the veracity of a witness, and is otherwise helpful to the jury is not an impermissible opinion on guilt. State v. Rafay, 168 Wn. App. 734, 806, 285 P.3d 83 (2012).

We consider a claim of improper opinion testimony raised for the first time on appeal if it is a manifest error affecting a constitutional right. RAP 2.5(a)(3); State v. Kirkman, 159 Wn.2d 918, 926-27, 155 P.3d 125 (2007). "Manifest error" requires a showing of actual and identifiable prejudice to the defendant's constitutional rights. Kirkman, 154 Wn.2d at 926-27. In the case of improper

21

opinion testimony, a defendant can show manifest constitutional error only if the record contains "an explicit or almost explicit witness statement on an ultimate issue of fact." Kirkman, 154 Wn.2d at 938.

In considering testimony that addresses witness demeanor, we consider (1) the type of witness involved, (2) the specific nature of the testimony, (3) the nature of the charges, (4) the type of defense, and (5) the other evidence before the trier of fact. Kirkman, 159 Wn.2d at 928.

Officer Pau testified that when L.B. reported the molestation, there was "nothing unusual" about L.B. or L.C.'s demeanor. Officer Pau said he would "have noted" anything that was "alarming or odd or startling" in his report.

Detective Unsworth testified that he observed L.C. during the interview with child interview specialist Webster. Detective Unsworth said he had been present for "hundreds" of child interviews. Detective Unsworth testified that families "react pretty differently" and there is "not one way to react." Detective Unsworth said he would have noted anything "unusual" about how L.B. or L.C. "were acting" in his report.

> Q.  If a mom or a guardian acted in a way that was startling to you or unusual or inappropriate, would you note that in your report?
> A.  Yes.
> Q.  Do you have any memory or did you note in your report any way that [L.B.] was acting that started — that you thought was inappropriate or unusual?
> A.  No.
> Q.  What about with the kid, if there was a way that they were acting that seemed unusual or startling to you or drew your attention, would you note that in your report?
> A.  Yes.
> Q.  And was [L.C.] acting in any way that concerned you or seemed unusual or startling?

22

A.     No.

In State v. Aguirre, 168 Wn.2d 350, 360, 229 P.3d 669 (2010), the Washington Supreme Court concluded police officer demeanor testimony was not improper where the officer "limited her testimony to her objective observations of the victim during their interview as compared to other victims whom [she] had interviewed during her lengthy criminal justice career" and "refrained from stating or implying that the victim had been a victim of domestic violence."

As in Aguirre, here, Officer Pau and Detective Unsworth testified based on objective observations as compared to other victims and did not state or imply that L.C. was a victim of child molestation. The testimony of Officer Pau and Detective Unsworth that there was "nothing unusual" about the demeanor of L.B. or L.C. does not constitute an opinion on guilt. Because the testimony was not improper opinion testimony, Leyva-Abitia cannot establish manifest constitutional error.[12]

Cumulative Error

Leyva-Abitia contends the cumulative error doctrine warrants reversal. Cumulative error may warrant reversal even if each error standing alone would otherwise be considered harmless. State v. Greiff, 141 Wn.2d 910, 929, 10 P.3d 390 (2000). But where, as here, "the errors are few and have little or no effect on the outcome of the trial," the doctrine "does not apply." State v. Weber, 159 Wn.2d 252, 279, 149 P.3d 646 (2006).

---

[12] Accordingly, Leyva-Abitia cannot show deficient performance for failing to object. State v. Fortun-Cebada, 158 Wn. App. 158, 172, 241 P.3d 800 (2010).

Statement of Additional Grounds

Leyva-Abitia raises a number of issues in his statement of additional grounds. Under RAP 10.10, we review only issues that "inform the court of the nature and occurrence of alleged errors." RAP 10.10(c).

Leyva-Abitia contends his attorney provided ineffective assistance of counsel by not calling his spouse to testify. "The decision whether to call a witness is ordinarily a matter of legitimate trial tactics and will not support a claim of ineffective assistance of counsel." State v. Kolesnik, 146 Wn. App. 790, 812, 192 P.3d 937 (2008).

Leyva-Abitia claims his attorney was "not present" on the last day of trial. The record shows his attorney was present throughout trial. Leyva-Abitia argues the court erred by instructing the jury that he was innocent until proven guilty. The jury instruction is an accurate statement the law. State v. Killingsworth, 166 Wn. App. 283, 288, 269 P.3d 1064 (2012).

We affirm the jury conviction on two counts of child molestation in the first degree of L.C.

Schindler, J.

WE CONCUR:

Dwyer, J.

Becker, J. P. T.