IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| THE STATE OF WASHINGTON, | ) | No. 77561-8-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| JOSE RENE RENE-GOMEZ, | ) | |
| | ) | |
| Appellant | ) | FILED: October 7, 2019 |

SCHINDLER, J. — A jury convicted Jose Rene Rene-Gomez of two counts of child

molestation in the second degree and communication with a minor for immoral

purposes. Rene-Gomez seeks reversal, arguing (1) the information omitted an

essential element of the crime of communication with a minor for immoral purposes, (2)

the court erred in admitting a text message into evidence, and (3) prosecutorial

misconduct during closing argument and cumulative error violated his right to a fair trial.

Rene-Gomez also challenges imposition of a number of community custody conditions.

We affirm the jury convictions and the judgment and sentence.

FACTS

Y.O.-G. and A.D.G. are the parents of D.D.-O. and her younger sister B.D. Y.O.-

G. and A.D.G. separated in 2010 when D.D.-O. was in the third grade. D.D.-O. "loved

her dad very much" and was very upset and "sad" when her parents separated. D.D.-O. spent time with A.D.G. every month.

In 2011, Y.O.-G. and her two daughters moved into an apartment with her boyfriend Jose Rene Rene-Gomez. Rene-Gomez assumed a parenting role with D.D.-O. and B.D. and insisted they "call him Dad."

Rene-Gomez would often wrestle or "play fight[ ]" with the girls and tickle them on the stomach. After D.D.-O. turned 11, when Rene-Gomez wrestled with her, he "started touching other places" such as her breasts, buttocks, and vagina. D.D.-O. "didn't like it" and "tried to stop playing around like that with him." D.D.-O. would get away from Rene-Gomez "[a]s fast as [she] could" or avoid him by locking herself in the bathroom. Sometimes, Rene-Gomez would hold down D.D.-O.'s arms to prevent her from getting away.

D.D.-O. said that "whenever my mom wasn't around," Rene-Gomez would try to touch her breasts with his hands over her clothes. One time, Rene-Gomez tried to put his hands down D.D.-O.'s shorts to touch her vagina. Another time while on a camping trip, Rene-Gomez kissed D.D.-O. on the lips, not "like a dad kissing a daughter." D.D.-O. tried to avoid Rene-Gomez at home by spending most of the time in her bedroom.

When D.D.-O. was approximately 13 years old, Y.O.-G. asked Rene-Gomez to help her enforce the rules with D.D.-O. D.D.-O. had to ask Rene-Gomez for permission to do certain things. D.D.-O. and Rene-Gomez often exchanged text messages in Spanish and in English when she asked for permission to do "something or go[ ] somewhere."

In April 2015, Y.O.-G. purchased underwear for 13-year-old D.D.-O., including a pair of white "boy cut" underpants. On April 20, D.D.-O. sent a text message to Rene-

2

Gomez saying she was delayed but was on her way home. In response, Rene-Gomez said, "[I]s ok I want you to send me a pic of you." D.D.-O. sent Rene-Gomez a photograph of her face. Rene-Gomez responded, "Thank u for the pic" with three "kissy face" emojis.[1]

The next day on April 21, Rene-Gomez sent D.D.-O. a text at 4:57 p.m. asking, "Are you there??" D.D.-O. responded, "I was fixing my room why." Rene-Gomez responds, "Ahhh ok good. Are you in your room?" D.D.-O. said, "No," she was in the bathroom. Rene-Gomez sent a text message asking D.D.-O. to send him a picture of her in the white boy-cut underpants—"[Take] a pic of you with the white short and send to me please." D.D.-O. asked, "Why." Rene-Gomez responded, "Cause I want tha pic[ ]please. . . . Send to me!! Please." D.D.-O. said, "I can't." Rene-Gomez insisted, "Yes you can!!" Rene-Gomez then sent a text message telling her, "Ok. [L]et make a deal! If you send the pic [I] will let you sleep over in joselin house and will give you money for tha night, this weekend!!" D.D.-O. responded, "I want to sleep at josselins but I'm not sending no pic." Rene-Gomez sent a text message saying, "Just think about it! Is your choi[c]e."

At 10:00 a.m. on April 24, D.D.-O. sent Rene-Gomez a text message asking for permission to go to a movie: "Dad can I go see a movie today with josselin?" Rene-Gomez responded, "Remember what you has to do if you want to go!! If you answer is not! [M]y is not too." D.D.-O. replied, "No because I can tell my mom what you want because that's not a good thing." Rene-Gomez then texted, "Is ok you can tell your mom . . . [a]nd I will tell her what [I] [k]now about you." D.D.-O. replied, "I will tell her

---

[1] An "emoji" is a small symbol or image used in electronic communication, including text message, to convey information or the writer's emotions.

3

everything." Rene-Gomez asked, "Are you sure you want to do this?? Just for one pic?" D.D.-O. replied, "I don't want to send a pic and you keep touching me when I told you to stop and you don't stop and you get mad because I don't like it and take it out on me even though I [b]ehave well." D.D.-O. did not tell Y.O.-G. that day about Rene-Gomez touching her because she was "scared" he would kick them out of the apartment.

On April 25, Rene-Gomez asked D.D.-O. again to send the photograph—"I want a pic of you!! Please . . . . Please!!!"—followed by more text messages that said, "Please please please" with four "[c]rying" emojis and, "Some day you gonna need something from me." D.D.-O. refused the repeated requests to take a photograph of herself in the white underpants.

On May 20, D.D.-O. sent a text message to Rene-Gomez asking for permission to go to the park with a friend. Rene-Gomez responded, "You know my answer!! . . . When I asked you to send me a pic and you said no. . . . My answer will be no whenever you want to go out, do you remember??" D.D.-O. responded, "Please[ ] dad . . . . Or I will tell mom everything because what you do is not right." Rene-Gomez responded, "Ok tell her, and you will have to get out of my house . . . . Good luck!!"

In mid- to late-June, D.D.-O. told her mother about Rene-Gomez inappropriately touching her. Y.O.-G. did not believe D.D.-O. Y.O.-G. planned to talk to Rene-Gomez about whether D.D.-O. was telling the truth.

On June 30, D.D.-O. told her father that Rene-Gomez was inappropriately touching her. A.D.G. called Y.O.-G. and Rene-Gomez before reporting the sexual abuse to Kent Police Officer Samuel Steiner. Officer Steiner and Detective Tami Honda went to the apartment to interview Y.O.-G. and D.D.-O. on June 30. Detective Honda

4

and Officer Steiner interviewed D.D.-O. and Y.O.-G. separately. Detective Honda took D.D.-O. and B.D. into protective custody. Child Protective Services placed D.D.-O. and B.D. with their father A.D.G.

On July 9, Detective Honda and the prosecutor interviewed D.D.-O. for approximately an hour. During the interview, D.D.-O. talked about the "inappropriate text messages" Rene-Gomez sent her but said she deleted the messages. Detective Honda asked D.D.-O. to bring her cell phone to the police station so a computer forensic detective could examine the phone and retrieve the messages. A.D.G. and D.D.-O. later delivered the cell phone to Detective Honda. A.D.G. gave the police permission to search the cell phone.

The police were able to retrieve and take "screenshots" of the text messages between D.D.-O. and Rene-Gomez from April 2, 2015 through June 3, 2015. After reviewing the screenshots, on August 11, Detective Honda went to the apartment to interview Rene-Gomez.

By amended information, the State charged Rene-Gomez with two counts of child molestation in the second degree in violation of RCW 9A.44.086 and communication with a minor for immoral purposes in violation of RCW 9.68A.090(2) between October 7, 2013 and June 1, 2015. Rene-Gomez pleaded not guilty.

The seven-day jury trial began August 8, 2017. The defense theory was D.D.-O. was not credible and her allegation of sexual abuse was "a lie." The State called A.D.G., Officer Steiner, Y.O.-G., D.D.-O., Detective Honda, and Detective Eric Moore to testify. The court admitted a number of exhibits into evidence, including the white boy-cut underpants; screenshots of the text messages retrieved from D.D.-O.'s cell phone, exhibit 6; and exhibit 15, a spreadsheet of 309 text messages between D.D.-O. and

5

Rene-Gomez from April 2, 2015 until June 3, 2015. Exhibit 15 includes the date, the time sent and received, and the content of the messages. Certified Spanish interpreter Claudia A'Zar testified that she translated the text messages that were in Spanish into English. The court admitted the screenshots with the translated text messages as exhibit 12.

A.D.G. testified that he and Y.O.-G. were together for 10 ½ years. A.D.G. said that after he and Y.O.-G. separated, A.D.G. spent time with his daughters on the weekends.

A.D.G. testified that on June 30, 2015, D.D.-O. called and asked him to come meet her outside the apartment building where she lived. A.D.G. said D.D.-O. was "worried, crying. And, well, that's what concerned me quite a bit to see her like that" because "I've seen her cry very few times." D.D.-O. told A.D.G. that "her mom's boyfriend" was inappropriately touching her. A.D.G. did not ask about "specific details." A.D.G. called Y.O.-G. because "I wanted to know why she hadn't done anything if she knew about it before I did." A.D.G. contacted Rene-Gomez and told him that he "would pay for it. . . . I had to do the right thing as a father" and planned to "go to the police."

A.D.G. testified that the police contacted him later that same day to come get the two girls. A.D.G. said D.D.-O. "was like broken down. You could see her eyes were all watery from crying," and B.D. "didn't know what was going on."

A.D.G. noticed a "drastic change" in D.D.-O.'s behavior:

> For example, that she was always late to some classes, and the other thing is, that at my house, she didn't want to eat, and she was showing that she wasn't happy. . . . [H]er personality changed, or her character changed way too much, and she no longer wanted to spend time sharing with my family.

After approximately a year, B.D. returned to live with Y.O.-G. A.D.G. testified that "a few months ago," D.D.-O. decided to live with Y.O.-G. A.D.G. testified that D.D.-O. sometimes followed the rules and sometimes she did not. A.D.G. denied he and D.D.-O. "c[a]me up with this idea to accuse" Rene-Gomez.

On cross-examination, A.D.G. testified that he was angry with Rene-Gomez about the separation from Y.O.-G. and his daughters. A.D.G. admitted telling Rene-Gomez more than one time that "he was going to regret being with" Y.O.-G. A.D.G. admitted he told Rene-Gomez that "if he were to touch one of my daughters, I was going to kill him."

A.D.G. testified that when he called Y.O.-G. on June 30, 2015, he told her that if the children came to live with him to keep them "safe," Y.O.-G. and Rene-Gomez "could go on with their lives." Y.O.-G. would not agree. A.D.G. admitted that when he talked to Rene-Gomez on June 30, he threatened to kill him.

Officer Steiner testified he met with A.D.G. at the Kent police station on June 30, 2015. Based on A.D.G.'s report of sexual abuse, Officer Steiner contacted Detective Honda to conduct a "welfare check" at the apartment. Officer Steiner testified Rene-Gomez, Y.O-G., D.D.-O., and B.D. were at the apartment. Officer Steiner briefly interviewed Y.O.-G. while Detective Honda interviewed D.D.-O. After the interviews, Officer Steiner and Detective Honda agreed "there was a safety concern and we needed to do an emergency removal of the children." Officer Steiner testified D.D.-O. and B.D. "seemed happy" to stay with A.D.G. On cross-examination, Officer Steiner testified he and Detective Honda did not "refer [D.D.-O.] to a hospital" or "gather any physical evidence regarding a sexual assault."

7

Y.O.-G. testified that in June 2015, D.D.-O. "was very rebellious, staying quite away from the family." Y.O.-G. said D.D.-O. "didn't want to eat with all of us, she didn't want to go out with us. On weekends, it wasn't too often, but she would rather spend time at her girlfriends' houses, or sometimes she would like to go to her dad's." Y.O.-G. said that "sometimes" D.D.-O. was "a little disrespectful" and was not "nice" to Rene-Gomez.

Y.O.-G. testified that when D.D.-O. told her that Rene-Gomez inappropriately touched her, D.D.-O. "was crying" and "I had not seen her cry before." Y.O.-G. testified, "I got angry and I told her that I could not believe it; that I would have to talk to him and ask him whether she was saying the truth." Y.O.-G. said, "I did not believe her because she was very mad." Y.O.-G. asked D.D.-O. to "provide . . . proof." D.D.-O. told Y.O.-G. that she wanted to move out and live with her father.

Y.O.-G. testified that D.D.-O. was currently living with her. Y.O.-G. described her behavior as "[v]ery good" and said D.D.-O. was doing well at school.

On cross-examination, Y.O.-G. testified that while living with Rene-Gomez, she did not work outside the home and was "pretty much in the apartment all the time." Y.O.-G. said that during the five years she was with Rene-Gomez, she never saw him inappropriately touch D.D.-O. Y.O.-G. testified that "right before" D.D.-O. told her about the inappropriate touching, "there was an argument between" D.D.-O. and Rene-Gomez about not letting her go out.

Y.O.-G. testified that on the weekends, D.D.-O. "wanted to spend time at her girlfriends' homes, or with her dad." Y.O.-G. said that during the week, D.D.-O. spent most of the time in her room or asking to go out with friends. Y.O.-G. testified that A.D.G. "spoiled" D.D.-O. and "pretty much let her do what she wanted."

D.D.-O. testified that "at first," she liked Rene-Gomez. D.D.-O. thought "he was nice" and "called him by his name." But then "he started making us call him Dad." D.D.-O. testified Rene-Gomez "said if we ever ask him for something and we don't call him Dad that we don't get it," and that made her "mad" because "he was trying to act like our dad when he wasn't." D.D.-O. said Y.O.-G. told her that she had to ask Rene-Gomez for "permission to go do something."

D.D.-O. testified that when they first started living with Rene-Gomez in 2011, she and Rene-Gomez would often engage in "wrestling or tickling fights." D.D.-O. testified that beginning in 2012, Rene-Gomez started touching her on her breasts, buttocks, and vagina. D.D.-O. testified that Rene-Gomez inappropriately touched her more than 100 times between the age of 11 and 13.

D.D.-O. testified about the text messages with Rene-Gomez from April 2, 2015 through June 3, 2015. D.D.-O. said that in April 2015, her mother bought her underwear, including a white pair of underpants. D.D.-O. testified Rene-Gomez sent her a text message asking her to take a photograph "of you with the white short and send to me please." D.D.-O. stated she never showed Rene-Gomez the white underpants. D.D.-O. testified she never talked to Rene-Gomez about her "underwear not fitting" and Rene-Gomez "brought up the underwear first." D.D.-O. testified that Rene-Gomez repeatedly asked and she refused to send him a photograph of her in the white underpants.

When D.D.-O. asked Rene-Gomez on April 24, 2015 if she could go to a movie with her friend, he again requested a photograph of D.D.-O. in the white underpants. D.D.-O. told him, "I can tell my mom what you want because that's not a good thing." Rene-Gomez replied, "And I will tell [your mom] what I [k]now about you." D.D.-O.

9

testified that Rene-Gomez was referring to the boyfriend her mother did not know about at the time.

D.D.-O. said she did not tell Y.O.-G. about the sexual abuse in April because "I was scared of what he was gonna do" because "he threatened to take us out of the apartment."

Q: How come you didn't already tell your mom in April what [Rene-Gomez] was doing to you?
A: I was scared of what he was gonna do.
Q: What do you mean?
A: Because he threatened to take us out of the apartment and all that.
Q: Was your mom working at this time, or working consistently?
A: No.
Q: Did she do occasional jobs?
A: No, not at that time.
Q: Who was really bringing the money into the house?
A: Both.
Q: Both who?
A: Him and my mom.
Q: How was your mom bringing money into the house?
A: She used the money my dad would give her to pay bills and food.

D.D.-O. testified that after she disclosed the sexual abuse to Y.O.-G. and Y.O.-G. did not believe her, she told her dad.

On cross-examination, D.D.-O. admitted, "I just didn't like [Rene-Gomez] because he wanted us to call him Dad when he wasn't our dad" and he "tried to act like" her dad. D.D.-O. testified she was "mad" at Rene-Gomez because he "wouldn't let" her "go out with" friends. D.D.-O. said she wanted to live with her father A.D.G. D.D.-O. said her dad would let her go out and do whatever she wanted and she "would be able to go out all day." D.D.-O. testified that during the five years Rene-Gomez and Y.O.-G. were together, she "wanted to move back in with" A.D.G. for approximately four years.

Defense counsel asked D.D.-O. how she was able to fend off Rene-Gomez. D.D.-O. answered, "I would try to kick and move my arms to get him to let go of me."

D.D.-O. said she and Rene-Gomez argued in June 2015 because he would not let her go out with friends. But D.D.-O. testified that she was not "mad." D.D.-O. said she "felt bothered. . . . [J]ust because I didn't send him a picture, he was taking it out on me and [not] letting me go out, and then he was threatening me to do things too."

D.D.-O. admitted that when she told Y.O.-G. about Rene-Gomez, she had already packed a bag to move in with A.D.G.

Detective Honda testified about the interviews she conducted with D.D.-O., Y.O.-G., and Rene-Gomez. Detective Honda testified that when she interviewed D.D.-O. at the apartment on June 30, D.D.-O. "was really upset. She was sobbing, just shaking, nervous." Detective Honda said, "I was sitting with her. I just kinda let her talk through the crying." When Detective Honda told D.D.-O. that she and B.D. would be placed in the custody of their father, D.D.-O. was "upset to be leaving her mom, but she also was happy to be leaving the apartment." Detective Honda said D.D.-O. "was already packed" and helped Detective Honda "pack up her sister to leave."

Detective Honda said that during the hour-long second interview on July 9, D.D.-O. "was quiet" and "seemed a little bit scared." But D.D.-O. provided more specific information about the touching and the underpants and talked about the text messages.

After reviewing screenshots of the text messages from D.D.-O.'s cell phone, Detective Honda interviewed Rene-Gomez at the apartment on August 11. When Detective Honda asked whether he inappropriately touched D.D.-O., Rene-Gomez "said no, that he wouldn't do anything on purpose to hurt her." Rene-Gomez admitted that "a couple months prior to when we were talking to him that he had been tickling, wrestling, play fighting with [D.D.-O.] on the couch and had accidently touched her breast." Detective Honda asked Rene-Gomez about the white underpants. Rene-Gomez said

11

Y.O.-G. "asked him if she could buy" some underpants for D.D.-O. "and he said yes." Rene-Gomez told Detective Honda that the white underpants "looked like shorts." Rene-Gomez said that he sent D.D.-O. a text message asking for a photograph of her wearing the white underpants because D.D.-O. "told him that her underwear and bras were too small and he needed proof to see that they were too small." Rene-Gomez told Detective Honda that he "barely texted" with D.D.-O. Rene-Gomez said D.D.-O. "would ask about doing something or going somewhere via text, but other than that he did not text her much."

Detective Eric Moore is trained in digital forensics. Detective Moore testified he conducted a forensic search of D.D.-O.'s cell phone "to recover text messages, including deleted text messages." Detective Moore created a spreadsheet of the text messages he retrieved from April 2, 2015 to June 3, 2015, exhibit 15. The spreadsheet identifies the date the text message is sent and received as well as the content of the text message.

The jury found Rene-Gomez guilty of two counts of child molestation in the second degree and communication with a minor for immoral purposes. The court imposed a low-range concurrent sentence of 57 months, community custody conditions, and no contact with D.D.-O. for 10 years.

## ANALYSIS

Rene-Gomez seeks reversal. Rene-Gomez argues the information omitted an essential element of the crime of communication with a minor for immoral purposes, the court erred in admitting a text message into evidence, prosecutorial misconduct during closing argument, and cumulative error violated his right to a fair trial. Rene-Gomez also challenges imposition of a number of community custody conditions.

Sufficiency of the Charging Document

For the first time on appeal, Rene-Gomez claims the amended information omitted an essential element of communication with a minor for immoral purposes in violation of RCW 9.68A.090(2). A defendant may raise a challenge to the constitutional sufficiency of a charging document for the first time on appeal. State v. Kjorsvik, 117 Wn.2d 93, 102, 812 P.2d 86 (1991). We review the adequacy of a charging document de novo. State v. Johnson, 180 Wn.2d 295, 300, 325 P.3d 135 (2014).

The accused has the constitutional right to know the charges alleged against him. Johnson, 180 Wn.2d at 300 (citing U.S. CONST. amend. VI; WASH. CONST. art. I, § 22). Under the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington State Constitution, "[a]ll essential elements of a crime, statutory or otherwise, must be included in a charging document in order to afford notice to an accused of the nature and cause of the accusation against him." Kjorsvik, 117 Wn.2d at 97. "The information is constitutionally sufficient 'only if all essential elements of a crime, statutory and nonstatutory, are included in the document.'" Johnson, 180 Wn.2d at 300 (quoting State v. Vangerpen, 125 Wn.2d 782, 787, 888 P.2d 1177 (1995)).

The "essential elements rule exists 'to apprise the accused of the charges against him or her and to allow the defendant to prepare a defense.'" Johnson, 180 Wn.2d at 300 (quoting Vangerpen, 125 Wn.2d at 787). "If the State fails to allege every essential element, then the information is insufficient and the charge must be dismissed without prejudice." Johnson, 180 Wn.2d at 300-01. "'An essential element is one whose specification is necessary to establish the very illegality of the behavior

13

charged.' " State v. Zillyette, 178 Wn.2d 153, 158, 307 P.3d 712 (2013)[2] (quoting State v. Ward, 148 Wn.2d 803, 811, 64 P.3d 640 (2003)); Johnson, 180 Wn.2d at 300.

Where the defendant challenges the sufficiency of the information for the first time on appeal, we "liberally construe the language of the charging document in favor of validity." Zillyette, 178 Wn.2d at 161. Liberal construction requires determining whether "the necessary elements appear in any form, or by fair construction, on the face of the document and, if so," whether "the defendant [can] show he or she was actually prejudiced by the unartful language." Zillyette, 178 Wn.2d at 162 (citing Kjorsvik, 117 Wn.2d at 105-06). "Under this rule of liberal construction, even if there is an apparently missing element, it may be able to be fairly implied from language within the charging document." Kjorsvik, 117 Wn.2d at 104. We read the language of a charging document as a whole and include facts which are necessarily implied. Kjorsvik, 117 Wn.2d at 109. Definitions of terms that establish the elements of a crime are not essential elements. State v. Smith, 159 Wn.2d 778, 787-88, 154 P.3d 873 (2007); State v. Lorenz, 152 Wn.2d 22, 34-35, 93 P.3d 133 (2004).

The information alleged Rene-Gomez committed the crime of communication with a minor for immoral purposes in violation of RCW 9.68A.090(2). RCW 9.68A.090(2) states, in pertinent part:

> A person who communicates with a minor for immoral purposes is guilty of a class C felony punishable according to chapter 9A.20 RCW if . . . the person communicates with a minor . . . for immoral purposes . . . through the sending of an electronic communication.

RCW 9.68A.090(3) expressly provides that "[f]or the purposes of this section, 'electronic communication' has the same meaning as defined in RCW 9.61.260." RCW

---

[2] Internal quotation marks omitted.

9.61.260(5) defines "electronic communication" to mean "the transmission of information by . . . <u>electronic text messaging</u>."[3] RCW 9.68A.011(5) defines "minor" as "any person under eighteen years of age." "Immoral purposes" refers to "sexual misconduct." <u>State v. McNallie</u>, 120 Wn.2d 925, 932-33, 846 P.2d 1358 (1993) (citing <u>State v. Schimmelpfennig</u>, 92 Wn.2d 95, 102-03, 594 P.2d 442 (1979)).

In <u>McNallie</u>, the Washington Supreme Court held RCW 9.68A.090 "prohibits communication with children for the predatory purpose of promoting their exposure to and involvement in sexual misconduct." <u>McNallie</u>, 120 Wn.2d at 933. In <u>State v. Hosier</u>, 157 Wn.2d 1, 8-9, 133 P.3d 936 (2006), the court defined "communicate" to mean both the transmission of the defendant's message and the receipt by the minor of an inappropriate message. "[A] defendant communicates with a minor under RCW 9.68A.090 if he or she <u>invites</u> or <u>induces</u> the minor to engage in prohibited conduct." <u>State v. Jackman</u>, 156 Wn.2d 736, 748, 132 P.3d 136 (2006).[4]

The amended information charging Rene-Gomez with communication with a minor for immoral purposes in violation of RCW 9.68A.090(2) tracks the language of the statute and case law. The amended information alleged:

> That the defendant Jose Rene Rene-Gomez in King County, Washington, between October 7, 2013 and June 1, 2015, did communicate with D.D.-O. (10/7/01), a person he believed to be a minor, for immoral purposes of a sexual nature and such communication occurred through the sending of an electronic communication;
> Contrary to RCW 9.68A.090(2).

Rene-Gomez contends the language of the amended information does not include the nonstatutory element of intent to communicate with a minor. Specifically, that the amended information did not allege that he intended the communication to

---

[3] Emphasis added.
[4] Emphasis in original.

15

reach D.D.-O. Rene-Gomez cites <u>Hosier</u> to argue alleging intent that the communication reached the minor is an essential element of the crime. The Supreme Court in <u>Hosier</u> held, "Foreseeability is not an element of the crime of communicating with a minor for immoral purposes. Rather, the State must prove that the defendant intended that the communication reach the child." <u>Hosier</u>, 157 Wn.2d at 15.

The question is whether all of the words used in the information charging Rene-Gomez with communication with a minor for immoral purposes would reasonably apprise him of the elements of the crime charged. <u>Kjorsvik</u>, 117 Wn.2d at 109. "Words in a charging document are read as a whole, construed according to common sense, and include facts which are necessarily implied." <u>Kjorsvik</u>, 117 Wn.2d at 109. Liberally construed, the language of the amended information fairly implies that Rene-Gomez intended the communication to reach D.D.-O. The amended information alleged Rene-Gomez communicated with D.D.-O., a minor, for immoral purposes of a sexual nature by sending D.D.-O. an electronic communication. The language "through the sending of an electronic communication" to D.D.-O., "a person he believed to be a minor," for immoral purposes of a sexual nature fairly implies that Rene-Gomez intended the communication to reach D.D.-O.

<u>Kjorsvik</u> is analogous. In <u>Kjorsvik</u>, a defendant challenged the robbery conviction because the charging document omitted the implied essential element of "intent to steal." <u>Kjorsvik</u>, 117 Wn.2d at 96, 98. The court held it would be "hard to perceive how the defendant" could have forcefully taken money from the shopkeeper while brandishing a weapon but did not intend to steal the money. <u>Kjorsvik</u>, 117 Wn.2d at 110. Likewise, here, because the charging document alleges Rene-Gomez sent

16

electronic communication to D.D.-O., a person he believed to be a minor, a fair reading is that through that volitional act, he intended the text message to reach D.D.-O.

Liberally construed, the language of the charging document contained all the necessary facts to apprise Rene-Gomez of the elements of communication with a minor for immoral purposes in violation of RCW 9.68A.090(2).[5]

Text Message

Rene-Gomez contends the court erred in admitting a portion of the text message response from D.D.-O. to Rene-Gomez on April 24, 2015. In the days leading up to April 24, Rene-Gomez repeatedly asked D.D.-O. to send him a photograph of her wearing the white underpants and D.D.-O. repeatedly refused to do so. On April 24, D.D.-O. sent a text to Rene-Gomez asking if she could go to a movie with a friend. In response, Rene-Gomez states, "Remember what you has to do if you want to go!! If you answer is not! [M]y is not too." In response, D.D.-O. told Rene-Gomez, "I don't want to send a pic and you keep touching me when I told you to stop and you don't stop and you get mad because I don't like it and take it out on me even though I [b]ehave well."

Pretrial, the defense moved to exclude the portion of the April 24 text message that states, "I don't want to send a pic and you keep touching me when I told you to stop and you don't stop and you get mad because I don't like it and take it out on me even though I [b]ehave well." Defense counsel argued the text message was inadmissible hearsay and unfairly prejudicial.

---

[5] We note Rene-Gomez does not argue that he was actually prejudiced by the charging language. See State v. Nonog, 169 Wn.2d 220, 231, 237 P.3d 250 (2010) (citing Kjorsvik, 117 Wn.2d at 106).

The prosecutor argued the text message was admissible under the rule of completeness under ER 106, as an expression of "her then existing state of mind and intent" under ER 803(a)(3), and as a prior consistent statement under ER 801(d)(1)(ii) "to rebut the defense's claim" that D.D.-O. "made this up." The trial court ruled the text message was admissible "as an expression of the young woman's then existing state of mind" and under the rule of completeness.

Rene-Gomez argues the trial court erred by ruling the text message was admissible under the state of mind exception to hearsay and the rule of completeness.

The State argues the text message is admissible as an expression of D.D.-O.'s existing state of mind under ER 803(a)(3) and as a prior consistent statement to rebut a claim of fabrication under ER 801(d)(1)(ii). The State concedes the rule of completeness does not apply. We accept the concession.

We review evidentiary rulings for an abuse of discretion. Peralta v. State, 187 Wn.2d 888, 894, 389 P.3d 596 (2017); State v. Brush, 183 Wn.2d 550, 560, 353 P.3d 213 (2015). "A trial court's determination that a statement is admissible pursuant to a hearsay exception is reviewed by this court under an abuse of discretion standard." State v. Woods, 143 Wn.2d 561, 595, 23 P.3d 1046 (2001). A court abuses its discretion if the decision is based on untenable grounds or untenable reasons. State v. Athan, 160 Wn.2d 354, 375-76, 158 P.3d 27 (2007). We can affirm an evidentiary ruling on any ground supported by the record. State v. Powell, 126 Wn.2d 244, 259, 893 P.2d 615 (1995).

The record supports the admission of the text message under ER 801(d)(1)(ii) as a prior consistent statement that is offered to rebut a claim of recent fabrication. ER

801(d)(1)(ii) provides:

> A statement is not hearsay if . . . [t]he declarant testifies at the trial or hearing and is subject to cross examination concerning the statement, and the statement is . . . consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive.

"The prior statement must have been made <u>before</u> the motive to falsify has arisen." <u>State v. Bargas</u>, 52 Wn. App. 700, 703, 763 P.2d 470 (1988).[6]

The defense theory at trial was that D.D.-O. was not credible and lied about the allegations of sexual abuse. The record shows D.D.-O. and Rene-Gomez argued about her request to send a photograph of her in the underpants in April 2015, well before she told her mother in June 2015 that Rene-Gomez sexually abused her. Because her mother did not believe her, D.D.-O. told her father on June 30 that Rene-Gomez sexually abused her. We also note that during closing argument, defense counsel focused on the timing of the argument and the disclosure to argue D.D.-O. was not credible:

> We know that [D.D.-O.] wanted to get out of the apartment. We knew that [D.D.-O.] didn't like Mr. [Rene-]Gomez. We know that [D.D.-O.] was acting out, that she was rebellious. She wanted to be out with her friends on the weekdays. . . . [W]e know that there is an argument between [D.D.-O.] and Mr. [Rene-]Gomez because he wouldn't let her go out with her friends right before the allegation. . . . [I]t is undisputed that this argument happened right before the allegation. . . .
>
> . . . .
>
> . . . [D.D.-O.] begins packing before police are even involved. Then this allegation comes out. What a coincidence.

The April 24, 2015 text message was admissible as a prior consistent statement under ER 801(d)(1)(ii) to rebut the claim of recent fabrication.

---

[6] Emphasis in original.

Prosecutorial Misconduct

Rene-Gomez contends prosecutorial misconduct during closing argument violated his constitutional right to a fair trial. In the alternative, Rene-Gomez asserts his attorney provided ineffective assistance of counsel by failing to object.

"The right to a fair trial is a fundamental liberty secured by the Sixth and Fourteenth Amendments to the United States Constitution and article I, section 22 of the Washington State Constitution." In re Pers. Restraint of Glasmann, 175 Wn.2d 696, 703, 286 P.3d 673 (2012). Prosecutorial misconduct may deprive a defendant of his constitutional right to a fair trial. Glasmann, 175 Wn.2d at 703-04.

We review allegations of prosecutorial misconduct during closing argument for abuse of discretion. State v. Lindsay, 180 Wn.2d 423, 430, 326 P.3d 125 (2014). To prevail on a claim of prosecutorial misconduct, the defendant must "show that in the context of the record and all of the circumstances of the trial, the prosecutor's conduct was both improper and prejudicial." Glasmann, 175 Wn.2d at 704; State v. Emery, 161 Wn. App. 172, 192, 253 P.3d 413 (2011). If the conduct was improper, we determine whether the prosecutor's improper conduct resulted in prejudice. State v. Emery, 174 Wn.2d 741, 760, 278 P.3d 653 (2012). Prejudice is established by showing a substantial likelihood the misconduct affected the verdict. Emery, 161 Wn. App. at 192.

A prosecutor has wide latitude during closing argument to draw reasonable inferences from the evidence. State v. Magers, 164 Wn.2d 174, 192, 189 P.3d 126 (2008). We review a prosecutor's comments in "the context of the total argument, the issues in the case, the evidence addressed in the argument, and the jury instructions." Emery, 161 Wn. App. at 192. "In analyzing prejudice, we do not look at the comments in isolation, but in the context of the total argument, the issues in the case, the

20

evidence, and the instructions given to the jury." State v. Warren, 165 Wn.2d 17, 28, 195 P.3d 940 (2008).

Where, as here, a defendant does not object at trial, any error is waived unless the prosecutor's misconduct was so flagrant and ill intentioned that an instruction could not have cured any resulting prejudice. Emery, 174 Wn.2d at 760-61. Under this heightened standard of review, the defendant must show that "(1) 'no curative instruction would have obviated any prejudicial effect on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.'" Emery, 174 Wn.2d at 761 (quoting State v. Thorgerson, 172 Wn.2d 438, 455, 258 P.3d 43 (2011)). In making that determination, we "focus less on whether the prosecutor's misconduct was flagrant or ill intentioned and more on whether the resulting prejudice could have been cured." Emery, 174 Wn.2d at 762.

"[A] prosecutor must not impugn the role or integrity of defense counsel." Lindsay, 180 Wn.2d at 431-32. However, it is not misconduct for the prosecutor to argue that evidence does not support the defense theory or is a fair response to the argument of the defense. Thorgerson, 172 Wn.2d at 448. Nor is it improper for a prosecutor to express indignation when the circumstances justify it. State v. Borboa, 157 Wn.2d 108, 123, 135 P.3d 469 (2006).

Rene-Gomez cites two remarks to argue the prosecutor improperly disparaged defense counsel during closing argument.

During cross-examination, the defense attorney questioned D.D.-O. about her testimony about "fending [Rene-Gomez] off":

Q:    How tall do you think you are?
A:    I'm four, eight.

21

Q:    What about Mr. [Rene-]Gomez, based on your recollection, how tall do you think he is?
A:    Five something.
Q:    And how much do you weigh, if you don't mind me asking.
A:    Right now I weight ninety-two.
Q:    Is it fair to say that Mr. [Rene-]Gomez is bigger than you?
A:    Yes.
Q:    Stronger than you?
A:    Yes.
Q:    You were talking earlier about fending him off?
A:    Yes.
Q:    How were you able to do that?
A:    I would try to kick and move my arms to get him to let go of me.
Q:    And that would work?
A:    No.
Q:    You spoke earlier about times when he tried to touch you and you fought him and you got away.
A:    Because he will let go of me.

In closing argument, the prosecutor addressed the cross-examination of D.D.-O. about her testimony that she fended off Rene-Gomez and the defense theory that D.D.-O. was not credible:

[I]f you remember [defense counsel] asked [D.D.-O.] about her size, she said she was about four feet, I believe, and under a hundred pounds. She agreed that Mr. [Rene-]Gomez was much bigger than her. And [defense counsel]'s questions sounded surprised that this small girl was able to fight off such a larger attacker.
    First, it is fairly disgusting, disrespectful, and offensive to say that a sexual assault victim should not be believed because she was able to stop her attacker from further harming her. Remember, many of these incidents, they occurred in the house, and it would be logical for Mr. [Rene-]Gomez not to put up much of a fight when he knows that all it takes is [Y.O.-G.] to round the corner at the wrong time, and then his cover is blown. This would have been a terrifying, horrifying experience for a young girl, and perhaps [D.D.-O.] even acted stronger than she knew possible when she started kicking at and flailing her limbs when Mr. [Rene-]Gomez grabbed her. So, it is possible that she was able to fight him off. And I want you to think about the opposite for a second. If [defense counsel] asked her that question and [D.D.-O.] stated that she did not fight off Mr. [Rene-]Gomez, then the argument would likely be to you, "Well, she's lying because of course a victim would try to fight off her attacker." The fact is is that none of us are in a position to opine how

22

[D.D.-O.], a sexual assault victim, should have behaved during that attack. She's the victim. The onerous is not on her to act in any certain way.[7]

Rene-Gomez did not object. Rene-Gomez cites Thorgerson to argue the prosecutor disparaged or impugned the role of his defense counsel by stating it was "fairly disgusting, disrespectful, and offensive" to suggest D.D.-O. should not be believed because she was able to fend off Rene-Gomez. In Thorgerson, the court concluded the prosecutor impugned defense counsel's integrity by referring to his presentation of his case as " 'bogus' " and involving " 'sleight of hand.' " Thorgerson, 172 Wn.2d at 451-52. The court concluded the "sleight of hand" argument was ill-intentioned misconduct. Thorgerson, 172 Wn.2d at 452. However, because "the victim's testimony was consistent throughout the trial and was consistent with what the witnesses testified she had told them before the trial," the court concluded the misconduct "cannot fairly be said to have had a substantial likelihood of altering the jury's determination that relevant evidence showed the defendant committed these crimes." Thorgerson, 172 Wn.2d at 452. The court also concluded a curative instruction would have "alleviated any prejudicial effect of this poorly thought out attack on defense counsel's strategy." Thorgerson, 172 Wn.2d at 452.

Here, the remark that "it is fairly disgusting, disrespectful, and offensive to say that a sexual assault victim should not be believed" is improper. But when viewed in context, after making the remark, the prosecutor focused on the evidence and testimony to argue why D.D.-O.'s testimony that she was able to fend off Rene-Gomez was credible. In context, we conclude the misconduct "cannot fairly be said to have had a

---

[7] Emphasis added.

substantial likelihood of altering the jury's determination." Thorgerson, 172 Wn.2d at 452. We also note that a curative instruction would have obviated any prejudicial effect.

The second remark Rene-Gomez contends disparaged defense counsel is the argument that the "sole purpose" of some of the information presented at trial is to "muddy the waters or to distract."

> So, what exactly is the State's burden? During the course of any trial, you're going to receive a lot of information, a lot of facts, and much of that information will be useful in order to decide whether the defendant is guilty. But some of that information, its sole purpose is to muddy the waters or to distract, and I want to give you a visual example because some people are more visual, of what I am required to prove and what I am not require[d] to prove. Now, I want to be clear, hold me to my burden, hold the State to its burden. It's one the State fully embraces. But I anticipate later you will hear about many facts of which I am not required to prove or disprove. So, there's a world of what I'm required to prove, a world of what I'm not required to prove, and there's a level of proof required for each of those categories. The things I am required to prove I must prove beyond a reasonable doubt. It still leaves some room, but it's beyond a reasonable doubt, not an unreasonable doubt. It doesn't mean disproving every theory. Things that I'm not required to prove, I have no burden whatsoever. So, I must prove that there was sexual contact between the defendant and [D.D.-O.], and I must prove that he communicated with her for immoral purposes of a sexual nature. What am I not required to prove? I'm not required to prove that there was or was not DNA.[8] I'm not required to prove that there was a sexual assault kit, that there was any injury to [D.D.-O.], that there were additional eyewitnesses, her story does not need to be corroborated, that there was a confession, that Mr. [Rene-]Gomez even had a motive. That's not something the State's required to prove, but in a sexual assault case, it's pretty clear why. He had a sexual desire for her. I don't have to prove or disprove that she was or was not an angry child, that she was a typical victim, or that these messages were deleted or were not deleted.[9]

Rene-Gomez did not object to the remark. The statement that the "sole purpose" of some of the information presented at trial is to "muddy the waters or to distract" was

---

[8] Deoxyribonucleic acid.
[9] Emphasis added.

made in the context of addressing the State's burden of proof and did not improperly disparage defense counsel.

In the alternative, Rene-Gomez contends his attorney provided ineffective assistance of counsel by not objecting to the two remarks during closing argument. We review a claim of ineffective assistance of counsel de novo. State v. Sutherby, 165 Wn.2d 870, 883, 204 P.3d 916 (2009). To establish a claim of ineffective assistance of counsel, Rene-Gomez must show both deficient performance and prejudice. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); State v. Grier, 171 Wn.2d 17, 32-33, 246 P.3d 1260 (2011); Emery, 174 Wn.2d at 754-55.

Rene-Gomez cannot show defense counsel's representation "fell below an objective standard of reasonableness" based on consideration of "all the circumstances" and that defense counsel's deficient performance prejudiced him. Strickland, 466 U.S. at 687-88. There is a strong presumption that the representation was effective. Strickland, 466 U.S. at 689; In re Pers. Restraint of Hutchinson, 147 Wn.2d 197, 206, 53 P.3d 17 (2002). The lack of objection from defense counsel " 'strongly suggests to a court that the argument or event in question did not appear critically prejudicial' " in context. State v. McKenzie, 157 Wn.2d 44, 53 n.2, 134 P.3d 221 (2006)[10] (quoting State v. Swan, 114 Wn.2d 613, 661, 790 P.2d 610 (1990)).

In addition to overcoming the strong presumption of competence, Rene-Gomez must affirmatively show prejudice. Strickland, 466 U.S. at 693. Rene-Gomez must show that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland, 466 U.S. at 687. "The likelihood of a different result must be substantial, not just conceivable." Harrington v. Richter, 562 U.S. 86,

---

[10] Emphasis added.

112, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011). Rene-Gomez cannot show that but for defense counsel's failure to object to the two remarks, the result of the trial would have been different.

Cumulative Error

Rene-Gomez contends cumulative error denied him a fair trial. The cumulative error doctrine applies if there are "several trial errors that standing alone may not be sufficient to justify reversal but when combined may deny a defendant a fair trial." State v. Greiff, 141 Wn.2d 910, 929, 10 P.3d 390 (2000); In re Pers. Restraint of Cross, 180 Wn.2d 664, 690, 327 P.3d 660 (2014), abrogated on other grounds by State v. Gregory, 192 Wn.2d 1, 427 P.3d 621 (2018). Where, as here, any error had little or no effect on the outcome of the trial, reversal is not required. Cross, 180 Wn.2d at 690-91; State v. Weber, 159 Wn.2d 252, 279, 149 P.3d 646 (2006).

Community Custody Conditions

In his opening brief, Rene-Gomez challenges the following community custody conditions the court imposed at sentencing, arguing the conditions are not crime related or vague and overbroad:

5. Inform the supervising CCO[11] and sexual deviancy treatment provider of any dating relationship. Disclose sex offender status prior to any sexual contact. Sexual contact in a relationship is prohibited until the treatment provider approves of such.

9. Do not enter sex-related businesses, including: x-rated movies, adult bookstores, strip clubs, and any location where the primary source of business is related to sexually explicit material.

10. Do not possess, use, access or view any sexually explicit material as defined by RCW 9.68.130 or erotic materials as defined by RCW 9.68.050 or any material depicting any person engaged in sexually explicit conduct as defined by RCW 9.68A.011(4) unless given prior approval by your sexual deviancy provider.

11. Do not use or consume alcohol.

---

[11] Community corrections officer.

26

18.    . . . Stay out of areas where children's activities regularly occur or are occurring. This includes parks used for youth activities, schools, daycare facilities, playgrounds, wading pools, swimming pools being used for youth activities, play areas (indoor or outdoor), sports fields being used for youth sports, arcades, and any specific location identified in advance by [the Department of Corrections] or CCO.

After filing the opening brief, the Washington Supreme Court issued its decision in State v. Nguyen, 191 Wn.2d 671, 425 P.3d 847 (2018). In Nguyen, the court considered many of the same conditions Rene-Gomez challenges and held the conditions were crime related and not unconstitutionally vague. Nguyen, 191 Wn.2d at 675. We adhere to the decision in Nguyen and conclude conditions 5, 9, 10, and 18 are crime related and are not unconstitutionally vague.

We review community custody conditions for an abuse of discretion and reverse the conditions only if the conditions are manifestly unreasonable. Nguyen, 191 Wn.2d at 678. A "crime-related prohibition" is defined as "an order of a court prohibiting conduct that directly relates to the circumstances of the crime for which the offender has been convicted." RCW 9.94A.030(10). A court does not abuse its discretion if there is a "reasonable relationship" between the crime of conviction and community custody condition. Nguyen, 191 Wn.2d at 684 (citing State v. Irwin, 191 Wn. App. 644, 658-59, 364 P.3d 830 (2015)). The record supports imposition of condition 11, do not use or consume alcohol, as a crime-related condition. Below, the defense attorney conceded that alcohol use is a risk factor.

In his reply brief, Rene-Gomez challenges condition 10, arguing it is overbroad. In Nguyen, the court addressed the exact same condition:

"Do not possess, use, access or view any sexually explicit material as defined by RCW 9.68.130 or erotic materials as defined by RCW 9.68.050 or any material depicting any person engaged in sexually explicit conduct

as defined by RCW 9.68A.011(4) unless given prior approval by your sexual deviancy provider."

Nguyen, 191 Wn.2d at 679. The court cited the decision in State v. Bahl, 164 Wn.2d 739, 193 P.3d 678 (2008), in concluding the condition was not unconstitutionally vague. Nguyen, 191 Wn.2d at 680-81.

Rene-Gomez concedes the court in Nguyen held that the exact same condition was not unconstitutionally vague but argues the court in Nguyen did not address whether the condition was overbroad. See Nguyen, 191 Wn.2d at 679-81. Rene-Gomez argues the condition that prohibits sexually explicit material is constitutionally overbroad because it includes protected speech. "A trial court's imposition of an unconstitutional condition is manifestly unreasonable." Nguyen, 191 Wn.2d at 678.

Whether the condition is overbroad is a question of law we review de novo. State v. Immelt, 173 Wn.2d 1, 6, 267 P.3d 305 (2011). Under the First Amendment to the United States Constitution, a condition is unconstitutionally overbroad "if it prohibits a substantial amount of protected speech." State v. Gray, 189 Wn.2d 334, 345, 402 P.3d 254 (2017). However, "[a]n offender's usual constitutional rights during community placement are subject to SRA[12]-authorized infringements." State v. Hearn, 131 Wn. App. 601, 607, 128 P.3d 139 (2006). A sentencing court may significantly restrict an offender's constitutional rights during community placement by imposing crime-related conditions. State v. Ross, 129 Wn.2d 279, 286-87, 916 P.2d 405 (1996); State v. Riles, 135 Wn.2d 326, 347, 957 P.2d 655 (1998), abrogated on other grounds by State v. Sanchez Valencia, 169 Wn.2d 782, 239 P.3d 1059 (2010). Because condition 10 is an

---

[12] Sentencing Reform Act of 1981, chapter 9.94A RCW.

SRA crime-related condition, we reject Rene-Gomez's challenge to imposition of the condition as unconstitutionally overbroad.

We affirm the jury conviction of two counts of child molestation in the second degree and communication with a minor for immoral purposes, the judgment and sentence, and imposition of the community custody conditions.

Schindler, J.

WE CONCUR:

Chun, C.J.

Smith, J.